Slip Op. 11-88

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

TAIAN ZIYANG FOOD                      :
    COMPANY, LTD., ET AL.,
                                       :

               *Plaintiffs*,           :

        v.                             :

UNITED STATES,                         :        Consol. Court No. 05-00399
                                       :
               *Defendant*,
                                       :
        and
                                       :
FRESH GARLIC PRODUCERS
    ASSOCIATION, ET AL.,               :

               *Defendant-Intervenors*. :
_____

[Sustaining in part U.S. Department of Commerce's second remand determination in administrative review of antidumping duty order covering fresh garlic from the People's Republic of China]

Dated: July 22, 2011

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Mark E. Pardo), for Plaintiffs Zhengzhou Harmoni Spice Co., Ltd., Jinan Yipin Corporation, Ltd., Linshu Dading Private Agricultural Products Co., Ltd., and Sunny Import & Export Co., Ltd.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jane C. Dempsey and Richard P. Schroeder); Reid Swayze, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

# OPINION

RIDGWAY, Judge:

In this consolidated action, the plaintiff Chinese producers and exporters of fresh garlic ("the Chinese Producers") challenged the final results of the U.S. Department of Commerce's ninth

administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China. *See generally* Taian Ziyang Food Co. v. United States, 33 CIT ____, 637 F. Supp. 2d 1093 (2009). Taian Ziyang analyzed each of the 10 issues that the Chinese Producers raised, sustaining Commerce's determination as to three of the issues, and remanding the remaining seven to the agency for further consideration. *See generally id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1100-02, 1166.

Now pending before the court is Commerce's Second Remand Determination, filed pursuant to Taian Ziyang. *See generally* Final Results of Redetermination Pursuant to Court Remand ("Second Remand Determination").[1] Although they raise no objections to Commerce's redeterminations as to four of the issues addressed in the Second Remand Determination, Plaintiffs Zhengzhou Harmoni Spice Co., Ltd. ("Harmoni"), Jinan Yipin Corporation, Ltd. ("Jinan Yipin"), Linshu Dading Private Agricultural Products Co., Ltd. ("Linshu Dading"), and Sunny Import & Export Co., Ltd. ("Sunny") – collectively referred to as the "GDLSK Plaintiffs" – continue to contest the agency's treatment of three issues. *See generally* GDLSK Plaintiffs' Comments Regarding the Department's Remand Redetermination ("GDLSK Comments"); GDLSK Plaintiffs' Reply Comments Regarding the Department's Remand Redetermination ("GDLSK Reply Comments"). The Government seeks a voluntary remand to allow Commerce to recalculate the surrogate value for the Chinese Producers' labor costs, but contends that the Second Remand

---

[1]The Government was granted a voluntary remand at the outset of this action, to give Commerce the opportunity to correct its omission of certain data from its labor wage rate calculation. *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1104. The result of that process was Commerce's First Remand Determination. *See* Final Results of Redetermination Pursuant to Court Remand (Dec. 5, 2005) (First Remand Pub. Doc. 10) ("First Remand Determination").

Determination should be sustained in all other respects.  *See* Defendant's Response to Comments Upon the Remand Redetermination ("Def. Response") at 1-2, 19.

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[2]  For the reasons detailed below, Commerce's Second Remand Determination is sustained in part, and this matter is remanded to the agency for further consideration not inconsistent with this opinion.

## I. <u>Background</u>

Seven Chinese producers and exporters of fresh garlic (the "Chinese Producers") brought this action to contest various aspects of the Final Results of Commerce's ninth administrative review of the antidumping duty order on fresh garlic from China, which covered the period from November 1, 2002 through October 31, 2003.  *See generally* Taian Ziyang, 33 CIT ____, 637 F. Supp. 2d 1093; Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 70 Fed. Reg. 34,082 (June 13, 2005) ("Final Results"); Notice of Amended Final Results of Antidumping Duty Administrative Review: Garlic from the People's Republic of China, 70 Fed. Reg. 56,639 (Sept. 28, 2005) ("Amended Final Results"); Final Results of Redetermination Pursuant to Court Remand (Dec. 5, 2005) (First Remand Pub. Doc. 10) ("First Remand Determination").[3]

---

[2]All citations to federal statutes are to the 2000 edition of the United States Code.  Similarly, all citations to federal regulations are to the 2002 edition of the Code of Federal Regulations.

[3]In the Amended Final Results, Commerce corrected certain ministerial errors.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1103-04.  In addition, as explained in note 1 above, the First Remand Determination corrected Commerce's omission of certain data from its labor wage rate calculation.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1104; n.1, *supra.*

<u>Taian Ziyang</u> sustained Commerce's use of "adverse facts available" in calculating the dumping margins for Taian Ziyang Food Company, Ltd. ("Ziyang") and Taian Fook Huat Tong Kee Foodstuffs Co., Ltd. ("FHTK"). *See* <u>Taian Ziyang</u>, 33 CIT at ____, ____, 637 F. Supp. 2d at 1124, 1166. <u>Taian Ziyang</u> similarly sustained Commerce's valuation of cold storage (challenged by the GDLSK Plaintiffs), as well as Commerce's calculation of surrogate financial ratios (challenged by Jinxiang Dong Yun Freezing Storage Co., Ltd. ("Dong Yun")). *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1144, 1166. In contrast, <u>Taian Ziyang</u> remanded for further consideration Commerce's valuation of certain "factors of production" necessary for the cultivation and export of fresh garlic – specifically, (1) garlic seed, (2) irrigation water, (3) labor, (4) leased land, (5) cardboard cartons, (6) plastic jars and lids, and (7) ocean freight. *See id.*, 33 CIT at ____, ____, ____, ____, ____, ____, ____, ____, 637 F. Supp. 2d at 1127, 1133, 1138, 1141, 1151-52, 1157, 1162, 1166.

In its Second Remand Determination, Commerce revalued irrigation expenses, leased land, ocean freight, and labor. *See* Second Remand Determination at 1-2, 11-16, 16-40, 40-41, 50-53, 60-73, 78-79. On the other hand, Commerce continued to value garlic seed, cardboard cartons, and plastic jars and lids as it did in the Final Results. *See id.* at 1-2, 4-11, 41-46, 46-50, 54-60, 73-76, 76-78.

As a result of its reconsideration in the course of the second remand, Commerce recalculated the weighted-average antidumping duty margin for Harmoni as 0.00% (down from 8.79%), for Jinan Yipin as 1.04% (down from 13.21%), for Linshu Dading as 4.34% (down from 7.97%), for Sunny as 4.22% (down from 9.17%), and for Dong Yun as 15.49% (down from 31.26%). *See* Second

Remand Determination at 79; Final Results, 70 Fed. Reg. at 34,085; First Remand Determination

at 19.  FHTK's margin remains unchanged at 15.75%.  *See* Second Remand Determination at 79;

First Remand Determination at 19.[4]

The GDLSK Plaintiffs contend that Commerce's wage rate calculation and its valuation of

cardboard cartons and plastic jars and lids do not comply with the instructions in Taian Ziyang.  *See*

*generally* GDLSK Comments; GDLSK Reply Comments.  The GDLSK Plaintiffs maintain that this

matter therefore should be remanded to the agency for further consideration.  *See* GDLSK

Comments at 2-3, 9, 14; GDLSK Reply Comments at 7.  The Government seeks a voluntary remand

to allow Commerce to recalculate the labor wage rate, but maintains that the Second Remand

Determination otherwise should be sustained.  *See* Def. Response at 1-2, 19.[5]

## II.  Standard of Review

In an action reviewing an antidumping determination by Commerce, the agency's

determination must be upheld except to the extent that it is found to be "unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i);

---

[4]The sole issue that Ziyang raised in this action was its challenge to Commerce's use of "adverse facts available," which was resolved in favor of the Government in Taian Ziyang.  *See* Taian Ziyang, 33 CIT at ____, ____, 637 F. Supp. 2d at 1100-01, 1124.  Ziyang thus had no stake in the most recent remand proceeding, and its dumping margin remains 12.58%.  *See* First Remand Determination at 19.

[5]Plaintiffs Ziyang, FHTK, and Dong Yun filed no comments on the Second Remand Determination at issue here.  The domestic producers of fresh garlic who intervened as defendant-intervenors – the Fresh Garlic Producers Association, and its individual members Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc. (the "Domestic Producers") – also filed no comments.

*see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same).  Moreover, any evaluation of the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).  That said, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial evidence.  Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).

Finally, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect."  NMB Singapore, 557 F.3d at 1319.  Nevertheless, "the path of Commerce's decision must be reasonably discernable," to support judicial review.  *Id.* (*citing* Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); *see also* Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (explaining that "it is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review,'" and that

"[f]ailure to provide the necessary clarity requires the agency action be vacated") (*quoting* Camp

v. Pitts, 411 U.S. 138, 142-43 (1973)); *see generally* 19 U.S.C. § 1677f(i)(3)(A) (requiring

Commerce to "include in a final determination . . . an explanation of the basis for its

determination").

## III. <u>Analysis</u>

Dumping occurs when goods are imported into the United States and sold at a price lower

than their "normal value," resulting in material injury (or the threat of material injury) to the U.S.

industry. *See* 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of

the goods and the U.S. price is the "dumping margin." *See* 19 U.S.C. § 1677(35).  When normal

value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping

margin are imposed to offset the dumping. *See* 19 U.S.C. § 1673.

Normal value is typically calculated using either the price in the exporting market (*i.e.*, the

price in the "home market" where the goods are produced) or the cost of production of the goods,

when the exporting country is a market economy country. *See generally* 19 U.S.C. § 1677b.[6]

However, where – as here – the exporting country has a non-market economy ("NME"), there is

often concern that the factors of production used to produce the goods at issue are under state

control, and that home market sales may not be reliable indicators of normal value. *See* 19 U.S.C.

---

[6]In addition, in certain market economy cases, Commerce may calculate normal value using
the price in a third country (*i.e.*, a country other than the exporting country or the United States).
*See*, *e.g.*, RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1338 (Fed. Cir. 2002) (*discussing* 19
U.S.C. §§ 1677b(a)(1)(B)(ii), 1677b(a)(1)(C)); *see also* Ningbo Dafa Chem. Fiber Co., Ltd. v.
United States, 580 F.3d 1247, 1251 n.1 (Fed. Cir. 2009) (explaining exception).

§ 1677(18)(A).

In cases such as this, where Commerce concludes that concerns about the sufficiency or reliability of the available data do not permit the normal value of the goods to be determined in the typical manner, Commerce "determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production," including "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *See* 19 U.S.C. § 1677b(c)(1); *see generally* Ningbo Dafa Chem. Fiber Co., Ltd. v. United States, 580 F.3d 1247, 1250-51 (Fed. Cir. 2009) (briefly summarizing "factors of production" methodology).[7]   The antidumping statute requires Commerce to value factors of production "based on the *best available information* regarding the values of such factors" in an appropriate surrogate market economy country – in this case, India. *See* 19 U.S.C. § 1677b(c)(1) (emphasis added); *see also* Shakeproof Assembly Components v. United States,  268 F.3d 1376, 1382 (Fed. Cir. 2001); Ningbo, 580 F.3d at 1254 (emphasizing that statute mandates that Commerce "shall" use "best available information" in valuing factors of production).

In determining which data constitute the "best available information," Commerce generally looks to the criteria set forth in its "Policy Bulletin 04.1," also known as the "NME Surrogate Country Policy Bulletin."  Policy Bulletin 04.1 explains:

> In assessing data and data sources, it is [Commerce's] stated practice to use investigation or review period-wide price averages, prices specific to the input in

---

[7]Factors of production "include, but are not limited to . . . hours of labor required, . . . quantities of raw materials employed, . . . amounts of energy and other utilities consumed, and . . . representative capital cost, including depreciation." *See* 19 U.S.C. § 1677b(c)(3); *see also* Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010) (discussing factors of production).

question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

See Import Administration Policy Bulletin 04.1, "Non-Market Economy Surrogate Country Selection Process," at "Data Considerations" (March 1, 2004)[8]; see also Second Remand Determination at 42 (quoting Policy Bulletin, and stating that it reflects agency's "well-established practice for determining the reliability and appropriateness of surrogate values"); id. at 47, 53; Issues and Decision Memorandum for the Administrative Review of the Antidumping Duty Order on Fresh Garlic from the People's Republic of China (June 6, 2005) (Admin. Record Pub. Doc. 348) ("Issues

---

[8]The stated purpose of Policy Bulletin 04.1 is to "provide[] guidance regarding [Commerce's] selection of surrogate market economy countries in non-market economy ('NME') cases." See Policy Bulletin 04.1, at "Statement of Issue." The language on which Commerce relies in this and many other cases appears in a section captioned "Data Considerations." See Policy Bulletin 04.1, at "Data Considerations." The policy bulletin expressly states that the criteria outlined in that section are for Commerce's use in winnowing the agency's list of potential surrogate countries "if more than one country has survived the selection process to this point" (i.e., if more than one country on the list of potential surrogates are economically comparable, produce comparable merchandise, and are "significant" producers of such merchandise). Id. Thus, the policy bulletin explains, "a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable." Id. Accordingly, pursuant to the policy bulletin, Commerce decides from among two or more countries that are economically comparable and significant producers of the merchandise by "assessing data and data sources" in the respective candidate countries in accordance with the criteria outlined in the section of the bulletin at issue. Id.

In short, the criteria outlined in the section of Policy Bulletin 04.1 captioned "Data Considerations" were developed to serve as a "tie-breaker," if necessary, in Commerce's identification of a surrogate country. The criteria were not promulgated for the purpose of guiding Commerce's selection from among alternative data sources after a surrogate country has been identified. Nevertheless, Commerce has used the criteria for that purpose here and in many other cases.

and Decision Memorandum") at 26, 39, 41.[9]

Within this general framework, the statute "accords Commerce wide discretion in the valuation of factors of production in the application of [the statute's] guidelines." *See* Shakeproof, 268 F.3d at 1381 (internal quotation marks and citation omitted)); *see also* Ad Hoc Shrimp Trade Action Committee v. United States, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (same); Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (same).  Commerce is recognized as the "master of antidumping law." *See* The Thai Pineapple Public Co. v. United States, 187 F.3d 1362, 1365 (Fed. Cir. 1999); *see also* Shakeproof, 268 F.3d at 1381 (acknowledging "Commerce's special expertise").  And "[t]he process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise." Shakeproof, 268 F.3d at 1381.

Nevertheless, Commerce's discretion is not boundless.  In exercising its discretion, Commerce is constrained by the purpose of the antidumping statute, which is "to determine antidumping margins 'as accurately as possible.'"  *See* Shakeproof, 268 F.3d at 1382 (*quoting* Lasko Metal Products, Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).  And,

---

[9]Because this action has twice been remanded to Commerce, three administrative records have been filed with the court: the initial administrative record (comprised of the information on which the agency's Final Results were based), the supplemental administrative record compiled in the course of the first remand, and the supplemental administrative record compiled in the course of the most recent remand (*i.e.*, the remand following Taian Ziyang).

Because confidential information is included in the administrative records, there are two versions of each: a public version and a confidential version.  The public versions of the administrative records consist of copies of all documents in the record, with confidential information redacted.  The confidential versions of the administrative records consist of complete, unredacted copies of only those documents that include confidential information.  All citations to the administrative records herein are to the public versions, which are cited as "Admin. Record Pub. Doc. ____," "First Remand Pub. Doc. ____," and "Second Remand Pub. Doc. ____," respectively.

Commerce's discretion notwithstanding, "a surrogate value must be as representative of the situation in the [non-market economy] country as is feasible."  *See* <u>Nation Ford</u>, 166 F.3d at 1377 (internal quotation marks and citation omitted).  Thus, "[i]n determining the valuation of . . . factors of production, the critical question is whether the methodology used by Commerce is based on *the best available information* and establishes antidumping margins *as accurately as possible*."  *See* <u>Ningbo</u>, 580 F.3d at 1257 (emphases added) (*quoting* <u>Shakeproof</u>, 268 F.3d at 1382) (internal quotation marks omitted).

In the present case, pursuant to the instructions in <u>Taian Ziyang</u>, Commerce reconsidered various aspects of the agency's valuation of the factors of production in the final results of the ninth administrative review of the antidumping duty order covering fresh garlic from China.  As discussed in greater detail below, Commerce's valuation of garlic seed (including retained garlic seed), irrigation costs, land lease costs, and ocean freight costs must be sustained.  On the other hand, Commerce's valuation of labor expenses, cardboard cartons, and plastic jars and lids must be remanded to the agency for further consideration.

## A.  <u>Valuation of Garlic Seed</u>

<u>Taian Ziyang</u> sustained challenges by FHTK and the GDLSK Plaintiffs to the data that Commerce selected to value garlic seed in its Final Results.  *See generally* <u>Taian Ziyang</u>, 33 CIT at ____, ____, 637 F. Supp. 2d at 1124-27, 1166.  Two of the GDLSK Plaintiffs – Harmoni and Jinan Yipin – went even further.  Specifically, Harmoni and Jinan Yipin asserted that it was improper for Commerce to assign to them any surrogate value for purchased garlic seed, because they do not use purchased seed and instead use seed retained from their prior years' harvests.  <u>Taian</u>

Ziyang addressed that claim as well.  *See generally id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at

1124-27, 1166.

In the Final Results, Commerce had rejected two sources of data provided by the respondent

Chinese producers – (1) prices reflected in Indian import data published by the World Trade Atlas

("WTA")[10] for the Indian Harmonized Tariff Schedule ("HTS") subheading covering "Garlic Fresh

or Chilled," and (2) price data from the Indian Agricultural Marketing Information Network

("Agmarknet").  Instead, the Final Results valued garlic seed using prices for varieties of Indian

garlic as listed in newsletters of the Indian National Horticultural Research and Development

Foundation ("NHRDF").  *See generally* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1124-27;

Issues and Decision Memorandum at 14-22.

In the Final Results, Commerce concluded, in essence, that the NHRDF data were the best

available information for valuing the respondent Chinese producers' garlic seed, because –

according to Commerce – the NHRDF data are more product-specific than the other two potential

sources of data on the record.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1125; Issues

and Decision Memorandum at 19-21.  However, Taian Ziyang faulted Commerce's determination,

emphasizing that "[n]either Commerce nor the Domestic Producers [who supplied the NHRDF data

to the agency] . . . provided a complete description of the 'high-yield' varieties [of garlic]

represented in the NHRDF data" for comparison to the respondent Chinese producers' garlic seed

---

[10]The World Trade Atlas is "a database of commodities using all levels of the Harmonized
Tariff Schedule," which "enables users to determine the value of a specific product and identify
countries to or from which the product is being exported or imported."  *See* Zhengzhou Harmoni
Spice Co. v. United States, 33 CIT ____, ____ n.20, 617 F. Supp. 2d 1281, 1296 n.20 (2009)
(internal quotation marks and citation omitted).

input.  *See* <u>Taian Ziyang</u>, 33 CIT at _____, 637 F. Supp. 2d at 1126.  <u>Taian Ziyang</u> therefore

remanded the matter to Commerce, instructing the agency to reconsider which of the three data sets

constitutes the best available information.  *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1127.

On remand, in accordance with <u>Taian Ziyang</u>, Commerce re-evaluated all three data sets on

the record and reaffirmed its determination that the NHRDF data are the most product-specific, and

therefore the best available information with which to value the Chinese producers' garlic seed.  *See*

*generally* Second Remand Determination at 4-8, 54-58.  In reaching its Second Remand

Determination, Commerce again dismissed both the Indian import statistics and the Agmarknet data

as insufficiently product-specific, pointing to the general, non-descriptive nature of categories used

in the Agmarknet data, and explaining that the tariff heading used for the Indian import statistics is

"extremely broad, encompassing all garlic imported into India."  *See generally id.* at 7-8.[11]

_____

[11]Commerce also expressed other concerns about the Indian import statistics, asserting that
the administrative record is devoid of "any substantive information [on] the manner in which such
garlic is shipped [into India], be it as whole bulbs or loose cloves," as well as lacking in information
concerning "the quality, size, or number of cloves in the garlic imports from the market economy
countries" reflected in the Indian import data.  *See* Second Remand Determination at 7.  But
Commerce's statement appears to be somewhat at odds with the administrative record as it now
exists.

As discussed in greater detail below, in the course of the most recent remand, Commerce
placed on the record of this proceeding a Market Research Report compiled by the Domestic
Producers, which was previously submitted for inclusion in the records of the eighth and tenth
administrative reviews.  *See* Second Remand Determination at 5; Market Research Report on Fresh
Whole Garlic in India (June 2003) (Second Remand Pub. Doc. 2) ("Market Research Report").  The
Market Research Report expressly states (in bold) that "[i]t should be noted that garlic is imported
[into India] in bulb form itself (*i.e.*, *not* cracked)."  *See* Market Research Report at 27.  Thus,
contrary to Commerce's assertion, the administrative record in this action in fact now does include
some "substantive information [on] the manner in which . . . garlic is shipped" into India – and the
agency either overlooked or ignored that information in its Second Remand Determination.

The Second Remand Determination observed that "with a bulb size well in excess of 5 cm in diameter, the garlic bulb grown by respondents is far larger than typical native Indian garlic strains, which usually have bulb diameters between 2 and 4 cm." *See* Second Remand Determination at 5; *see also id.* at 5-6 (surveying individual respondents' questionnaire responses, reporting bulb diameters ranging from 5 cm to 7 cm). To establish the similarity of the relevant

_____

Commerce was criticized for essentially these same failings in a related case concerning the same antidumping duty order. During the eighth administrative review, Commerce placed on the record the same Market Research Report at issue here for the very same purpose – that is, to prove the physical characteristics of the NHRDF garlic varieties and thus to demonstrate product-specificity. *See* Jinan Yipin Corp. v. United States, 31 CIT 1901, 1927, 526 F. Supp. 2d 1347, 1370 (2007) ("Jinan Yipin I"). Reviewing challenges to the agency's valuation of garlic seed in that administrative review, Jinan Yipin I found that, as in the present case, "Commerce . . . made no mention of certain factual information that is inconsistent with its findings," specifically "factual information [that] concerns the characteristics of Indian garlic imports . . . [which] is set forth in the very market research report upon which Commerce relies." *See id.*, 31 CIT at 1927, 526 F. Supp. 2d at 1370. As Jinan Yipin I explains, the Market Research Report "presents factual evidence – which Commerce did not reference or discuss . . . – that Chinese garlic imports constitute the overwhelming majority of all garlic imported in India, that Chinese garlic is imported in the form of whole bulbs, not loose cloves, and that these imports are comparable to the subject merchandise with respect to bulb diameter and number of cloves per bulb." *See id.*, 31 CIT at 1928, 526 F. Supp. 2d at 1370. Thus, here – as in Jinan Yipin I – the Market Research Report may supplement and inform the interpretation of the Indian import data submitted by the respondent Chinese producers, and contradicts (at least to some extent) "Commerce's assumption that the garlic represented by the import data differs significantly from the subject merchandise." *See id.*, 31 CIT at 1929, 526 F. Supp. 2d at 1372.

Nevertheless, Commerce's ultimate conclusion is not undermined. Reading between the lines of the Second Remand Determination, it appears that – as in the eighth administrative review – Commerce here "chose the NHRDF data over the import data for two principal reasons: its finding . . . that there is insufficient record information to establish what type of garlic was being imported *from countries other than China* and its conclusion that the prices . . . [of] the garlic imports from China are not based on market principles and therefore are less reliable than are prices of imports *from market economy countries*." *See* Jinan Yipin Corp. v. United States, 35 CIT ____, ____, 2011 WL 1399811 * 4-7 (2011) (emphases added) ("Jinan Yipin III") (critiquing thoroughly of Commerce's analysis of Market Research Report data, but nevertheless sustaining agency's use of NHRDF data).

NHRDF varieties, Commerce placed on the administrative record for the first time a June 2003

Market Research Report on Fresh Whole Garlic in India, which was compiled by the Domestic

Producers and included in the records of the eighth and tenth administrative reviews.  *See id.* at 5;

Market Research Report on Fresh Whole Garlic in India (June 2003) (Second Remand Pub. Doc.

2) ("Market Research Report").[12]  Relying on the Market Research Report, Commerce explained in

the Second Remand Determination that "the typical bulb diameter of the Agrifound Parvati and

Yamuna Safed-3 high yield garlic varieties [that Commerce] used to value respondents' inputs falls

within a similar range with a bulb diameter of 3.5 to 6.5 cm."  *See* Second Remand Determination

at 5-7 (*citing* Market Research Report at 14); *see also id.* at 56-57.[13]

By supplementing the administrative record with the Market Research Report, Commerce

has now "directly tie[d] the physical characteristics of respondents' input [*i.e.*, the Chinese

producers' garlic] to those of particular NHRDF varieties," demonstrating that "[Commerce's]

---

[12]*See also* Zhengzhou Harmoni, 33 CIT at  ____, 617 F. Supp. 2d at 1297-98 (discussing June 2003 Market Research Report, in context of review of tenth administrative review); Jinan Yipin I, 31 CIT at 1926-29, 526 F. Supp. 2d at 1369-72 (discussing June 2003 Market Research Report, in context of review of eighth administrative review).

[13]Although Commerce's overall analysis appears to rely upon the NHRDF price information for three varieties of garlic (*i.e.*, the Agrifound Parvati, Yamuna Safed-3, and Agrifound White varieties), Commerce's conclusion expressly mentions only "the typical bulb diameter of the Agrifound Parvati and Yamuna Safed-3 high yield garlic varieties," omitting reference to the Agrifound White variety.  *Compare* Second Remand Determination at 4 *and id.* at 7.  However, Commerce's conclusion also states that the bulb diameters of the relevant NHRDF varieties range from "3.5 to 6.5 cm."  *See id.*  According to the Market Research Report, the typical bulb diameters of the Agrifound Parvati and the Yamuna Safed-3 varieties are 50 to 65 millimeters and 50 to 60 millimeters, respectively, while the typical bulb diameter of the Agrifound White variety is 35 to 45 millimeters.  *See* Market Research Report at 14-15.  Thus, Commerce's conclusion apparently addressed the Agrifound White variety (which has a bulb diameter of 35 to 45 millimeters), even if the agency failed to mention that variety in its conclusion.

surrogate value data source [*i.e.*, the NHRDF data] approximates the large, high-quality bulb grown by respondents." *See* Second Remand Determination at 7.  Commerce has thus responded to the concerns raised in Taian Ziyang.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1124-27. Moreover, no party has filed comments on the Second Remand Determination on this issue.  *Cf.* Recording of Oral Argument at 32:05-32:22 (explaining that the GDLSK Plaintiffs are "now happy with [Commerce's garlic seed valuation], or at least [they are] not challenging it further").  As to the surrogate value for purchased garlic seed, Commerce's Second Remand Determination therefore must be sustained.

Taian Ziyang granted the Government a voluntary remand to permit Commerce to respond to the request of Jinan Yipin and Harmoni that, in calculating their dumping margins, the agency value garlic seed based on their reported company-specific growing factors of production for garlic seed (rather than using the surrogate value for purchased garlic seed that the agency employed for the other respondent Chinese producers), to properly reflect the fact that Jinan Yipin and Harmoni grow their garlic crop using seed retained from harvests in prior years.  *See* Taian Ziyang, 33 CIT at ____ & n.33, ____, ____, 637 F. Supp. 2d at 1124 & n.33, 1127, 1166.  In the Final Results, Commerce had rejected the approach advocated by Jinan Yipin and Harmoni.  *See id*., 33 CIT at ____, 637 F. Supp. 2d at 1127; Issues and Decision Memorandum at 21-22.  But, in the Second Remand Determination, Commerce reversed course and has now acceded to their request.  *See generally* Second Remand Determination at 8-11, 58-60.

The Second Remand Determination reaffirmed Commerce's practice of "valu[ing] self-produced inputs by valuing the inputs used to create the relevant self-produced inputs," and

stated that, in the present case, the agency "is again using its standard 'inputs-to-inputs' methodology in valuing self-produced garlic seed based upon the actual inputs used to create Jinan Yipin's and Harmoni's self-produced garlic seed." *See* Second Remand Determination at 59. Under that methodology, Commerce calculated surrogate values for the two respondents' reported inputs for growing garlic seed (*e.g.*, fertilizer; herbicide; pesticide; plastic film; skilled, unskilled, and indirect labor; and electricity), multiplying each factor by the per metric ton consumption rates for that factor, and adding up the results. *See id.* at 59-60. Commerce thus valued Jinan Yipin's and Harmoni's retained garlic seed based on the costs that they incurred to grow the retained seed, reasoning that "this method more accurately reflects Jinan Yipin's and Harmoni's production methodology and, thus, results in a more accurate normal value calculation." *See id.* at 59-60; *see also id.* at 11.

Because no party has filed comments on the Second Remand Determination on the issue, and because Commerce's valuation of the garlic seed retained by Jinan Yipin and Harmoni is supported by substantial evidence and is otherwise in accordance with law (as well as <u>Taian Ziyang</u>), this determination by Commerce also must be sustained.

## B.  <u>Valuation of Irrigation Costs</u>

<u>Taian Ziyang</u> sustained challenges by the GDLSK Plaintiffs and Dong Yun to the surrogate value that Commerce assigned for the irrigation water used in cultivating their garlic crops. *See generally* <u>Taian Ziyang</u>, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1101-02, 1127-33, 1166. As <u>Taian Ziyang</u> explained, the undisputed record evidence shows that the GDLSK Plaintiffs and Dong Yun did not pay for irrigation water (because they drew water from nearby rivers or wells on

the land that they farm), and further indicates that the situation of Indian garlic growers was no different. *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1128-29, 1131. In addition, <u>Taian Ziyang</u> acknowledged the concerns expressed by Dong Yun, among others, who asserted that separately valuing irrigation water resulted in double-counting because the cost of water is already reflected in the financial statements that Commerce used to calculate the surrogate financial ratios in this case. *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1128, 1132. <u>Taian Ziyang</u> further noted that, in the Final Results, Commerce not only assigned a value to irrigation water, but, in doing so, actually relied upon higher "industrial" water rates, rather than "agrarian" rates (which the agency determined were highly subsidized by the Indian government). *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1128, 1132-33; *see generally* Issues and Decision Memorandum at 22-26.

   <u>Taian Ziyang</u> rejected Commerce's claim that, as a legal matter, <u>Pacific Giant</u> required the agency to assign a value for irrigation water in the Final Results, without regard to whether or not Indian garlic growers actually pay for such water. *See* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1129-31 (discussing, *inter alia*, <u>Pacific Giant, Inc. v. United States</u>, 26 CIT 894, 896, 904-05, 223 F. Supp. 2d 1336, 1339, 1346 (2002) (addressing agency's treatment of water usage in production of freshwater crawfish tail meat in China)). <u>Taian Ziyang</u> criticized the Final Results for failing to "reconcile [Commerce's] reading of <u>Pacific Giant</u>, and [the agency's] determination on the valuation of water in this case, with the plain language of [the statute]," which requires, among other things, that factors of production be valued based upon "the prices or costs of [the] factors" of production in the relevant surrogate market economy country, and on "the best available information regarding the values of such factors" in the surrogate market economy country. *See*

Taian Ziyang, 33 CIT at _____, 637 F. Supp. 2d at 1129-30 (emphases omitted; alteration in original).

Taian Ziyang also observed that, even if (as the agency's interpretation of Pacific Giant suggests) Commerce is required to value irrigation water in a case such as this, there is nothing in Pacific Giant to indicate that the value assigned must necessarily be a *positive* value. *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1130.

Taian Ziyang concluded that, as a matter of law, "[i]f the record establishes that farmers in India – like the Chinese garlic producers in this case – do not pay for irrigation water drawn from nearby rivers or wells on their land, it is not clear how Commerce here can assign to water a surrogate value greater than zero. Any other outcome would appear to contravene both the plain language and the basic intent of the statute." *See* Taian Ziyang, 33 CIT at _____, 637 F. Supp. 2d at 1130; *see generally id.*, 33 CIT at _____, 637 F. Supp. 2d at 1130-31. In addition, Taian Ziyang found that "Commerce failed to adequately evaluate the record evidence on the cost of water in India – including the evidence on the nature and extent of government subsidization, if any." *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1133. Taian Ziyang therefore remanded the issue to Commerce, with instructions to "reconsider [the agency's] surrogate value analysis for water use . . . , . . . [to] detail its rationale for selecting from among the possible methods of valuing this factor (as supported by substantial evidence in the record), [and to] explain[ ] why the valuation method [chosen] . . . yields the most accurate dumping margin possible." *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1133.

In the most recent remand, Commerce has changed its fundamental approach to calculating the costs that the GDLSK Plaintiffs and Dong Yun incurred in irrigating their garlic crops. *See*

*generally* Second Remand Determination at 11-16.  Specifically,  Commerce has determined that

"valuing the pumping cost of water, rather than valuing the water itself, yields the most accurate

[dumping] margins because it most closely matches the irrigation practices of producers in the

surrogate country [*i.e.*, India]," and because it fulfills the agency's obligation to value factors of

production based on the prices or costs of the factors in the surrogate market economy country and

based on "the best available information."  *See id.* at 15-16.

In reaching its decision on remand, Commerce reviewed the undisputed record evidence,

which indicates that Jinan Yipin used diesel fuel to pump irrigation water into its fields, and that

Dong Yun, Harmoni, Linshu Dading, and Sunny used electricity for that purpose.  *See* Second

Remand Determination at 13.  Commerce similarly surveyed the ample and uncontroverted record

evidence demonstrating that – much like the GDLSK Plaintiffs and Dong Yun – Indian farmers also

do not pay for irrigation water that is drawn from their own wells.  *See id.* at 14.[14]  Based on the

_____

[14]The undisputed record evidence on expenses incurred for irrigation in India included (1) information provided in a letter and exhibit submitted by Dong Yun indicating "that Indian companies do not have to pay for irrigation water drawn from their own wells"; (2) a 1995 World Bank study "showing that [Indian] farmers who pump water from their own wells do not pay for the water they use to irrigate their crops"; (3) a 2001 statement from the International Water Management Institute ("IWMI") indicating that, as of that time, "in the Indian province of Uttar Pradesh, farmers that own their own wells do not pay for water to irrigate their land, and that self-owned wells are the largest source of water" in that province; (4) excerpts from the IWMI Annual Report (2000-01) stating that "India is one of the largest users of groundwater (wells), and that the use of groundwater (from wells) is uncontrolled and unregulated"; (5) an excerpt from a book on rural development (Krishna, Uphoff, & Esman, eds., *Reasons for Hope*: *Instructive Experiences in Rural Development* (West Hartford, CT: Kumarian, 1996)) explaining that "most irrigation in India is performed by wells that are fed by rainwater"; and (6) a statement from the office of the Agriculture Attache at the U.S. Embassy in New Delhi, stating that "Indian farmers who use water from their own wells do not pay any fee for it."  *See* Second Remand Determination at 14.

record evidence, Commerce determined that "farmers in India who have access to wells on their property do not pay for irrigation water." *See id*. at 15.  As a result, Commerce further determined that – as to the Chinese garlic producers here – "it is not reasonable to separately value the consumption of water for farmers who, having access to well or river water, are not otherwise obligated to pay either civil or private authorities for irrigation water." *See id*.

Based on the record evidence and the legal analysis as summarized above, Commerce's Second Remand Determination does not calculate a surrogate value for irrigation water itself, but – instead – calculates a surrogate value for the energy used to pump the irrigation water from its source into the field (*i.e.*, diesel fuel for Jinan Yipin, and electricity for the other GDLSK Plaintiffs and Dong Yun), and then applied that surrogate value to the actual quantity of diesel fuel or electricity consumed in pumping irrigation water as reported by each of the companies.  In addition, Commerce accounted for freight expenses incurred in transporting the diesel fuel from the diesel supplier to Jinan Yipin.  *See* Second Remand Determination at 16; *see also* <u>Jinan Yipin Corp. v. United States</u>, 35 CIT ____, ____, 2011 WL 1399811 * 1-2 (2011) ("<u>Jinan Yipin III</u>")  (in eighth administrative review, sustaining agency's surrogate valuation of irrigation costs as calculated in second remand determination in that case, where agency adhered to same basic approach used here).  No party has filed comments on the Second Remand Determination on this issue.

As discussed above, the Second Remand Determination's valuation of the irrigation costs

---

On remand, Commerce also reviewed the surrogate financial statements, and determined that they were of no assistance in "determin[ing] the irrigation practices of . . . Indian farmers" or in "ascertain[ing] whether or not separately valuing water . . . would result in double counting this expense."  *See* Second Remand Determination at 14-15.

incurred by the GDLSK Plaintiffs and Dong Yun is supported by substantial evidence and is

otherwise in accordance with law.  In addition, the Second Remand Determination on this issue

complies with the remand instructions in <u>Taian Ziyang</u>.  Commerce's determination therefore must

be sustained.

### C.  <u>Valuation of Labor Expenses</u>

The antidumping statute provides that, in non-market economy cases such as this, the

surrogate data used to calculate the value of factors of production must, to the extent possible, come

from market economy countries that are at "a level of economic development comparable to that of

the non-market economy country" at issue – in this case, China.  *See* 19 U.S.C. § 1677b(c)(4)(A).

The antidumping statute further provides that, in such cases, the surrogate data must, to the extent

possible, come from market economy countries that are "significant producers of comparable

merchandise."  *See id.*

For most factors of production, Commerce typically uses values from a single market

economy country (known as the "surrogate country" – here, India) that Commerce has determined

to be both (a) economically comparable to the non-market economy country in question and (b) a

significant producer of the goods at issue.  *See* 19 C.F.R. § 351.408(c)(2).  But <u>Taian Ziyang</u>

explained that Commerce treats the cost of labor quite differently than other factors of production.

*See* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1134; *see generally* <u>Dorbest Ltd. v. United</u>

<u>States</u>, 604 F.3d 1363, 1368 (Fed. Cir. 2010).

Concerned about "wide variances in wage rates between comparable economies," Commerce

historically has valued the cost of labor in an NME country case by using a regression-based wage

rate "reflective of the observed relationship between wages and national income in a variety of market economy countries." *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1134 (internal quotation marks and citations omitted); *see also id.*, 33 CIT at ____ n.44, 637 F. Supp. 2d at 1134 n.44 (summarizing history of 19 C.F.R. § 351.408(c)(3)).   Thus, "[u]nlike its valuation of other factors of production in [a non-market economy country] case, Commerce [has based] its surrogate wage rate on data from a broad 'basket' of countries, and [has] not limit[ed] itself to market economy countries at a level of economic development comparable to the NME country in question." *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1134.

In the Final Results, Commerce calculated the respondent Chinese producers' labor costs using the agency's regression-based wage rate calculation methodology, as set forth in the agency's regulations, to establish a surrogate wage rate for China.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1134-35; 19 C.F.R. § 351.408(c)(3).  After correcting several clerical errors in the initial calculations in the Final Results (which yielded a surrogate wage rate of $0.93), Commerce's First Remand Results recalculated the applicable wage rate at $0.85.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1135.  The GDLSK Plaintiffs and Dong Yun challenged both the facial validity of Commerce's regression-based methodology and the agency's application of that methodology in the instant administrative review.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1133-35.

Specifically, the GDLSK Plaintiffs and Dong Yun argued, *inter alia*, that Commerce designated India as the primary surrogate market economy in this case, but – rather than using the Indian surrogate wage rate – Commerce used the regression-based methodology established in its regulations to calculate a wage rate that is "more than 500 percent higher than that of India."  *See*

Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1135 (internal quotation marks and citation

omitted). The GDLSK Plaintiffs and Dong Yun asserted, *inter alia*, that Commerce's regulation and

its application in this case were in conflict with the statutory requirement that Commerce value

factors of production using surrogate values from market economy countries that are both

economically comparable and significant producers of the goods comparable to those at issue. *See*

*id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1133-34, 1135; *see generally id.*, 33 CIT at ____, 637

F. Supp. 2d at 1133-38.

Relying heavily on Allied Pacific II (which held Commerce's regulation to be inconsistent

with the statute), Taian Ziyang remanded the issue of the valuation of the labor factor of production

to Commerce for further consideration. *See* Taian Ziyang, 33 CIT at ____, ____, ____, 637 F. Supp.

2d at 1134, 1135-36, 1138; Allied Pacific Food (Dalian) Co. v. United States, 32 CIT ____, ____,

587 F. Supp. 2d 1330, 1351-61 (2008) ("Allied Pacific II"). On remand, Commerce nevertheless

continued to use a regression-based methodology, albeit one that was slightly revised. *See generally*

Second Remand Determination at 16-40, 60–73.[15] According to Commerce, the agency "analyzed

all of the information on the administrative record, revised its methodology to be consistent with its

[then-]current practice, concluded that its revised methodology [produced] the 'best available

---

[15]In the most recent remand, Commerce used a somewhat updated version of the regression-based methodology that it had previously employed in this administrative review, pursuant to the agency's so-called "Revised Methodology Notice." *See* Second Remand Determination at 17 n.18; Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. 61,716, 61,719-23 ("Revised Methodology Notice"). Among other things, while the prior methodology considered a total of six years of wage data, the revised methodology considered only two years of data, in an effort to enhance the accuracy of Commerce's calculation of non-market economy wages. *See* Revised Methodology Notice, 71 Fed. Reg. at 61,721; *see also* Second Remand Determination at 17 n.18.

information' on the record," and sought to "explain[] how its methodology [was] consistent with the requirements of [the statute]." *See* Second Remand Determination at 17.  Besides limiting the data set to just two years of wage data (2001 and 2002), Commerce also modified the data set on remand "to include all countries for which suitable data are available, rather than limiting the[] data to the fifty-six countries utilized in the Final Results." *See id.* at 17 n.18.  The resulting calculation produced a regression-based surrogate wage rate of $0.77 for China.  *See id.*

Commerce's Second Remand Determination also took strong exception to <u>Taian Ziyang</u>'s conclusion that the agency's regulation prescribing the regression-based wage rate calculation methodology was inconsistent with the statute.  *See* Second Remand Determination at 18 n.19.  Indeed, the agency devoted more than 30 pages of the Second Remand Determination to attempts to explain and defend the agency's regression-based methodology and its resulting determination in this case.  *See generally id.* at 17-40, 63-69, 70-73.

In the meantime, however, the Court of Appeals handed down its decision in <u>Dorbest</u>, striking down Commerce's regulation as inconsistent with the plain language of the statute.  *See generally* <u>Dorbest</u>, 604 F.3d at 1366, 1369-73.  The Court of Appeals concluded that the agency's regulation "improperly requires using data from both economically comparable and economically dissimilar countries, and . . . improperly uses data from both countries that produce comparable merchandise and countries that do not."  *See* <u>Dorbest</u>, 604 F.3d at 1372 (discussing 19 C.F.R. § 351.408(c)(3)).  The Court therefore held Commerce's regulation to be invalid on its face:

> To the extent that 19 C.F.R. § 351.408(c)(3) requires or at least permits the use of labor value data from countries that are not economically comparable to the non-market economy country in question or are not significant producers of merchandise comparable to the merchandise in question when data from countries

meeting both criteria are available, the regulation is facially invalid as noncompliant with [the statute].

Dorbest, 604 F.3d at 1377.[16]

Armed with Dorbest, the GDLSK Plaintiffs have renewed their plea for the court to "reject Commerce's continued use of the invalidated regression-based wage rate calculation and remand this issue to Commerce with instructions to use available wage rate information that satisfies both requirements of 19 U.S.C. § 1677b(c)(4)."  See GDLSK Comments at 2-3.  The Government generally concurs, requesting a voluntary remand to allow Commerce to recalculate the surrogate value for labor expenses in a manner consistent with Dorbest.  See Def. Response at 18.  No other party has filed comments on this issue.

In light of the arguments of the GDLSK Plaintiffs and the Government's request for a voluntary remand, this matter must be remanded.  On remand, Commerce shall recalculate labor expenses in accordance with Dorbest and the plain language of the statute; and Commerce shall allow sufficient time for the submission of comments on the agency's draft results of the remand.

---

[16]Dorbest did not completely foreclose Commerce's use of data from countries that are not economically comparable and/or are not significant producers of the subject merchandise.  The Court of Appeals explained that, if Commerce were to "show in an appropriate situation that using the data Congress has directed Commerce to use is impossible," then "Commerce would be free to use whatever data it felt were appropriate to use to determine labor rates, presuming that Commerce remained within the bounds of 19 U.S.C. § 1677b(c)(1), which requires Commerce to use the 'best available information regarding the values of' the factors of production."  See Dorbest, 604 F.3d at 1372.

### D. Valuation of Leased Land

Taian Ziyang sustained Dong Yun's challenge to Commerce's decision to calculate a separate surrogate value for leased land. *See generally* Taian Ziyang, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1101-02, 1138-41, 1166. Taian Ziyang explained that, in the Final Results, Commerce had determined that "land lease costs were not accounted for in the surrogate financial ratios in this case because the [Indian surrogate companies'] financial statements [used to calculate those ratios] included a line item for land in their 'fixed assets' schedules, and because the surrogate companies listed zero depreciation for land" – indications which Commerce interpreted to mean that the Indian surrogate companies did not lease land but, rather, cultivated their crops on land that they owned. *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1140-41; *see generally* Issues and Decision Memorandum at 26-29.

As Taian Ziyang noted, however, Dong Yun maintained that Commerce was, in effect, double-counting land lease costs. According to Dong Yun, the Indian surrogate companies' financial statements already included rent and lease payments as part of "selling, general, and administrative" expenses. *See* Taian Ziyang, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1138-39, 1140, 1141. Highlighting several line items in the Indian companies' financial statements that would appear to indicate that those companies in fact did lease at least some portion of the land that they cultivated (reflecting costs for, *inter alia*, "leasehold land" and "Land (leasehold) and Development"), Taian Ziyang faulted Commerce for failing to reconcile its determination that the Indian companies did not lease land with record evidence to the contrary. *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1140, 1141. In addition, Taian Ziyang questioned Commerce's failure to

acknowledge and explain its apparent departure from past agency practice.  *See id.*, 33 CIT at \_\_\_\_,

\_\_\_\_, 637 F. Supp. 2d at 1139, 1141.  <u>Taian Ziyang</u> therefore remanded the matter to the agency for

further consideration.  *See id.*, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1140-41.

      In the Second Remand Determination, Commerce reversed course and determined that – as

Dong Yun has maintained – land lease costs indeed already were accounted for in the "selling,

general and administrative" costs of the surrogate financial companies.  *See generally* Second

Remand Determination at 40-41.  Specifically, upon reconsideration, Commerce found record

evidence "in the form of certain broad line items [in the financial statements of the Indian surrogate

companies], such as 'rent,' 'leasehold land,' and 'lease rent,' that indicates that the surrogate

companies may have leased land."  *See* Second Remand Determination at 41.  The Second Remand

Determination also conceded that, as <u>Taian Ziyang</u> observed, "prior decisions by [Commerce] have

assumed that, where a surrogate's financial statements contain a broad line item encompassing a

[factor of production], that [factor of production] is accounted for, and valuing the [factor of

production] separately would result in double-counting the cost."  *See* Second Remand

Determination at 41 (*citing* <u>Taian Ziyang</u>, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1140).  Commerce

therefore "[did] not use a separate calculated surrogate value for leased land" in its Second Remand

Determination.  *See* Second Remand Determination at 41.  No party has filed comments on this

matter.

      Because Commerce's Second Remand Determination on this issue complies with the

remand instructions in <u>Taian Ziyang</u>, and because it is supported by substantial evidence and is

otherwise in accordance with law, Commerce's determination must be sustained.

E.  Valuation of Cardboard Packing Cartons

In Taian Ziyang, the GDLSK Plaintiffs prevailed on their challenge to Commerce's surrogate

value for the cardboard cartons that the Chinese producers used to pack and ship garlic.  *See*

*generally* Taian Ziyang, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1101-02, 1144-52, 1166.

Taian Ziyang explained that, in the Final Results, Commerce valued cardboard cartons based on

Indian import statistics taken from the World Trade Atlas ("WTA") for Indian HTS subheading

4819.1001, covering cartons, boxes, and cases made of corrugated paper and paperboard.  *See* Taian

Ziyang, 33 CIT at ____, ____, 637 F. Supp. 2d at 1144, 1147-52; *see generally* Issues and Decision

Memorandum at 37-41.  In so doing, the Final Results rejected the other alternative source of data

on the record – four domestic price quotes submitted by the GDLSK Plaintiffs, which were obtained

within the period of review from four different Indian box vendors in four different cities for basic

cardboard packing cartons like those used by the Chinese producers.  *See* Taian Ziyang, 33 CIT at

____, 637 F. Supp. 2d at 1144; *see generally* Issues and Decision Memorandum at 37-41; GDLSK

Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 157), Exh. 16 (domestic price

quotes for cardboard packing cartons).  The Final Results rejected the domestic price quotes because

they do not constitute "publicly available information" and because, according to Commerce, they

do not reflect prices throughout the period of review.  *See* Taian Ziyang, 33 CIT at ____, 637 F.

Supp. 2d at 1145-46; Issues and Decision Memorandum at 39-40.

As Taian Ziyang noted, however, although the price quotes are "not without problems," the

Final Results significantly "overstated any potential concerns as to the reliability of the domestic

Indian box price quotes that the agency rejected, [and] significantly understated the patent flaws and

defects in the Indian import statistics on which the agency relied."  *See* Taian Ziyang, 33 CIT at

____, ____, 637 F. Supp. 2d at 1144, 1151 (emphases omitted).

### 1.   The Final Results' Treatment of the Domestic Price Quotes

Taian Ziyang explained that Commerce's concerns about the lack of "public availability"

of the price quotes are based on the potential for manipulation.  *See* Taian Ziyang, 33 CIT at ____,

637 F. Supp. 2d at 1146; Issues and Decision Memorandum at 39 (referring to "possible

manipulation").  But, as Taian Ziyang pointed out, the administrative record does not include even

a scintilla of evidence of distortion or manipulation, or evidence of any affiliation tainting the price

quotes at issue here.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1146-47.  Thus, in the

Final Results, Commerce – in effect – presumed distortion and affiliation, based on nothing more

than speculation and conjecture.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1147.  Moreover, most

of the concerns that the Final Results raised vis-a-vis the price quotes in this case are inherent in

price quotes, as well as other types of non-publicly available information.  Yet, as Taian Ziyang

observed, Commerce does not reject such information across the board.  To the contrary, Commerce

has relied on non-publicly available information – including price quotes – in numerous other cases

in the past.  *See  id.*, 33 CIT at ____, 637 F. Supp. 2d at 1147.[17]

---

[17]As a practical matter, public data simply may not be available for all factors of production.
In Vinh Quang, for example, the domestic producers submitted two price quotes, explaining that
they were "unable to obtain public prices for [the input at issue] because that item is not widely
traded in commercial markets."  *See* Vinh Quang Fisheries Corp. v. United States, 33 CIT ____,
____, 637 F. Supp. 2d 1352, 1355 (2009).  In the case at bar, there is no indication that price lists,
price bulletins, or other public pricing information was available but was ignored by the GDLSK
Plaintiffs.

Taian Ziyang was equally skeptical about Commerce's second basis for rejecting the domestic price quotes.  Taian Ziyang noted that the Final Results indicated that all four domestic price quotes are dated "within one week of one another" and referred to Commerce's general preference for price data that "reflect broad market averages" covering "a substantial period of time" rather than price data that reflect a more limited period of time, due to concerns about "temporary market fluctuations."  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1145; *see also* Issues and Decision Memorandum at 38, 40.  However, as Taian Ziyang pointed out, the two cases that the Final Results cited to support Commerce's preference – Shrimp from Vietnam and Synthetic Indigo from the PRC – are readily distinguished from this case. *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1145-46 (discussing Notice of Preliminary Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances and Postponement of Final Determination: Certain Frozen and Canned Warmwater Shrimp From the Socialist Republic of Vietnam, 69 Fed. Reg. 42,672 (July 16, 2004); Synthetic Indigo From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 68 Fed. Reg. 53,711 (Sept. 12, 2003)); Issues and Decision Memorandum at 40.

Specifically, in Shrimp from Vietnam, Commerce rejected price quotes for shrimp which were from only one week of the period of investigation.  But the record in that case included affirmative evidence of price fluctuations.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1146 (discussing Shrimp from Vietnam, 69 Fed. Reg. at 42,684).  As Taian Ziyang noted, the record here is devoid of any such evidence.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1146.  Similarly, in Synthetic Indigo from the PRC, Commerce rejected price quotes for plastic bags that

were dated anywhere from seven to ten months after the end of the period of review.  *See  id.*, 33

CIT at _____, 637 F. Supp. 2d at 1146 (*citing* Issues and Decision Memorandum at 40); Issues and

Decision Memorandum for Final Results of the Antidumping Duty Administrative Review on

Synthetic Indigo from the People's Republic of China – June 1, 2001, through May 31, 2002, 2003

WL 24153859 (ITA), at Comment 11 (Sept. 12, 2003).  In contrast, as <u>Taian Ziyang</u> explained, the

price quotes in this case are contemporaneous, entirely from within the period of review.  *See* <u>Taian</u>

<u>Ziyang</u>, 33 CIT at _____, 637 F. Supp. 2d at 1146; *see also* Issues and Decision Memorandum at 40.

Even more to the point, <u>Taian Ziyang</u> noted that, as the GDLSK Plaintiffs observed, *all other*

*things being equal*, it makes sense for Commerce to privilege prices that reflect broad market

averages and cover a substantial period of time over price data from a more limited time frame.  *See*

<u>Taian Ziyang</u>, 33 CIT at _____, 637 F. Supp. 2d at 1145.  But, here, all other things clearly are not

equal.  *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1145.  As the GDLSK Plaintiffs put it, Commerce

here was faced with a choice between, on the one hand, "four domestic, product-specific,

contemporaneous price quotes" and, on the other hand, "overly broad trade data which is inclusive

of air freight."  *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1145 (quoting GDLSK Plaintiffs' brief)

(internal quotation marks omitted).

## 2.  The Final Results' Treatment of the Indian Import Statistics

<u>Taian Ziyang</u> observed that the Final Results not only sought to emphasize the potential

shortcomings of the domestic price quotes (as discussed above), but, in addition, sought to minimize

the evident and admitted flaws in the Indian import statistics on which the Final Results relied (as

set forth in greater detail below).

As a threshold matter, <u>Taian Ziyang</u> highlighted Commerce's longstanding policy favoring the use of domestic data, rather than import statistics (all other things being equal) – a general policy that the agency did not honor here. *See* <u>Taian Ziyang</u>, 33 CIT at ____ & nn. 60-61, 637 F. Supp. 2d at 1148 & nn.60-61. And <u>Taian Ziyang</u> also took note of two basic problems specific to the Indian import statistics that Commerce used, which have the effect of distorting the surrogate value for cardboard cartons in this case.

<u>Taian Ziyang</u> first noted that it is undisputed that the domestic price quotes are much more "product specific" than the Indian import statistics on which Commerce here relied. *See* <u>Taian Ziyang</u>, 33 CIT at ____, ____, 637 F. Supp. 2d at 1149, 1151-52. HTS subheading 4819.1001 – the subheading for which Commerce has import statistics – covers gift, specialty, and many other types of non-packing boxes, in addition to the sort of plain cardboard packing cartons that the Chinese producers here use to ship their garlic. *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1149.

<u>Taian Ziyang</u> noted that the Final Results acknowledged that the Indian import statistics include "many different types of boxes." *See* Issues and Decision Memorandum at 38. But, rather incredibly, the Final Results then asserted that "that fact alone does not undermine the use of the value." *See id.* As <u>Taian Ziyang</u> pointedly observed, Commerce's statement "simply defies logic." *See* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1149. It is beyond cavil that the inclusion of these other more expensive products drives up the price data captured in the Indian import statistics that Commerce used in this case. *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1149. The only question is the extent of that inflation.

The Final Results attempted to address the over-breadth of the Indian import statistics, asserting that "the total quantity of gift boxes was less than ten percent of the total carton imports," and that "more than fifty percent of the entries . . . [made under HTS subheading 4819.1001] are simply categorized as boxes or cartons, with no other specifications." *See* Issues and Decision Memorandum at 38-39. But, as Taian Ziyang noted, trade intelligence data from Infodrive India and other information submitted by the GDLSK Plaintiffs belies Commerce's efforts to downplay the many products included in the Indian import statistics that are much more expensive than the cardboard packing cartons at issue here. *See* Taian Ziyang, 33 CIT at _____, 637 F. Supp. 2d at 1149-50 (and authorities cited there).[18]  The trade intelligence data indicate, for example, that the vast majority of entries reflected in the Indian import statistics on which Commerce relies are, in fact, more expensive gift and specialty boxes – products that are not comparable to the basic cardboard packing cartons used by the Chinese producers here. *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1149-50.  As such, Taian Ziyang rejected "Commerce's glib conclusion – that 'the fact that different boxes for different purposes have entered . . . under [HTS subheading 4819.1001] does not, in and of itself, call this value into question'" – as a determination that "simply cannot be

---

[18]As Taian Ziyang explained, "Infodrive India is a service that 'compile[s] and disseminate[s] official import statistics.'"  Taian Ziyang, 33 CIT at _____ n.56, 637 F. Supp. 2d at 1144 n.56 (*quoting* Zhejiang Native Produce and Animal By-Products Import & Export Group Corp. v. United States, 32 CIT _____, _____ n.7, 2008 WL 2410210 * 6 n.7 (2008)).

Although Commerce's Second Remand Determination states that the trade intelligence data was drawn from Eximkey.com, the documentation submitted by the GDLSK Plaintiffs indicates that the information was taken from Infodrive India. *Compare* Second Remand Determination at 42 *with* GDLSK Respondents' Second Surrogate Value Submission (Admin. Record Pub. Doc. 258), Exh. 2; *see also* Taian Ziyang, 33 CIT at _____, 637 F. Supp. 2d at 1144 (discussing GLDSK Plaintiffs' submission of "trade intelligence data" from Infodrive India).

credited." *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1150 (*quoting* Issues and Decision Memorandum at 39) (alteration in original).

Quite apart from the fact that the Indian import statistics are distorted by apparently vast quantities of gift and specialty boxes that are clearly more expensive than the basic cardboard packing cartons that the Chinese garlic producers used, Taian Ziyang explained that the Indian import statistics are even further distorted by the inclusion of boxes that were shipped by air. *See generally* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1150-51.  As Taian Ziyang noted, the Final Results failed to directly confront this issue. *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1150. The analysis in the Final Results totaled a single brief paragraph, which was silent on the substantive merits of the effect of the inclusion of air freight charges in the Indian import statistics on which Commerce relied:

> Some companies may import cartons in to the PRC by air, others may not . . . .  This point alone, however, does not undermine the [agency's] rationale . . . .  Furthermore, the respondents have not submitted on the record of this review anything that demonstrates that their own domestic carton suppliers did not import some [cartons] into the PRC by air.

*See* Issues and Decision Memorandum at 40 (*quoted in* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1150).

Taian Ziyang observed that, "[r]ather than grappling with the merits of the GDLSK Plaintiffs' concerns about the distortive effects of air freight charges," the Final Results "summarily dismissed them" by stating that "[m]ere allegations of facts, absent any record evidence for support of such claims, cannot be a basis for undermining the use of publicly available, contemporaneous valuation data from Indian HTS categories in this case." *See* Taian Ziyang, 33 CIT at ____, 637 F.

Supp. 2d at 1150 (*quoting* Issues and Decision Memorandum at 40).  But, as Taian Ziyang noted,

nothing in the record supports the Final Results' suggestion that the Chinese garlic producers or their

Indian counterparts "used packing cartons that were *imported* – much less imported *by air*."  *See*

Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1150.[19]

### 3.  The Remand in *Taian Ziyang*

Taian Ziyang concluded that the Final Results "failed to explain how the Indian import data

is the 'best available information,' particularly in light of the domestic Indian price quotes which

represent 'values [that] are much more specific to the cartons used for garlic packing.'"  *See* Taian

Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1151-52 (*quoting* GDLSK Plaintiffs' brief); *see also id.*,

33 CIT at ____, 637 F. Supp. 2d at 1144.  In addition, Taian Ziyang concluded that the Final Results

"failed to support [Commerce's] selection of the Indian import statistics by reference to substantial

---

[19]Taian Ziyang explained that, "[m]uch as in Yantai Oriental," it is difficult to fathom (and Commerce has failed to explain) "why the [Chinese producers] would have used imported packing cartons (much less cartons imported by air), when such basic packaging materials were available domestically."  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1151 (*citing* Yantai Oriental Juice Co. v. United States, 26 CIT 605, 617 (2002)).  And Taian Ziyang noted that, indeed, the GDLSK Plaintiffs have stated that they source their cardboard packing cartons domestically, and that, by the same token, Indian garlic producers similarly have no reason to buy more expensive imported boxes since such boxes can be supplied domestically.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1151.

Relying on Hebei Metals II, Taian Ziyang explained that Commerce's policy favoring the use of domestic data (rather than import statistics) is "'most appropriate where [– as here – ] the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process.'"  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1150 (*quoting* Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1274 (2005)) ("Hebei Metals II"); *see also* Taian Ziyang, 33 CIT at ____ & nn.60-61, 637 F. Supp. 2d at 1148 & nn.60-61 (discussing Commerce policy favoring use of domestic data, rather than import statistics).

evidence in the record."  *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1152; *see also id.*, 33 CIT at

_____, 637 F. Supp. 2d at 1144.  Taian Ziyang therefore remanded this issue to Commerce for further

consideration.  *See id.*, 33 CIT at _____, 637 F. Supp. 2d at 1152, 1166.

Unfortunately, however, Commerce's Second Remand Determination is wholly unresponsive

to Taian Ziyang.

### 4.  The Second Remand Determination's Treatment of the Domestic Price Quotes

The Second Remand Determination adds virtually nothing to this case; and, in fact, it is

incorrect as to at least one key finding.  Specifically, the Second Remand Determination states (in

two different places) that the four price quotes at issue were "not contemporaneous" with the period

of review – a statement that is patently false.  *See* Second Remand Determination at 43 (stating that

price quotes are "not contemporaneous"); *id.* at 75 (stating that "[t]he price quotes . . . do not reflect

prices during the [period of review]").[20]  The magnitude of Commerce's error calls into question the

agency's "bottom line" on this issue (*i.e.*, the agency's determination that the Indian import statistics

are the "best available information" for use in determining the surrogate value for cardboard

cartons), and, taken alone, is sufficient to necessitate another remand.

In other words, the Second Remand Determination reflects a determination by Commerce

that the four domestic price quotes were not the "best available information" because the price

quotes (1) were not "publicly available," and, according to Commerce, (2) were not representative

---

[20]*But see* Issues and Decision Memorandum at 40 (acknowledging that "the price quotes fall
within the [period of review]"); Taian Ziyang, 33 CIT at _____ n.57, 637 F. Supp. 2d at 1145 n.57
(same).

of "broad market averages" covering "a substantial period of time," and (3) were not contemporaneous with the period of review. *See*, *e.g.*, Second Remand Determination at 42-43 (rejecting the four price quotes because they "are not publicly available, not contemporaneous, and are not representative of prices throughout the [period of review]"); *see generally id.* at 41-46, 73-76. Because Commerce itself has yet to correct its error concerning the contemporaneity of the domestic price quotes, it cannot be said with certainty that the agency would not have reached a different conclusion as to the "best available information" for use in determining the surrogate value for cardboard cartons if the agency had recognized that the price quotes in this case in fact are contemporaneous with the period of review. At the very least, the agency's "calculus" presumably would have been considerably different.[21] Further, the gravity of Commerce's error raises serious questions about the degree of care taken in the preparation of the Second Remand Determination, and – even more importantly – the extent of the independence of the agency's review of individual issues both within this proceeding and vis-a-vis other related cases.[22]

---

[21]The Government's brief does not repeat Commerce's erroneous statement as to the contemporaneity of the four price quotes; but it also makes no effort to acknowledge or seek to correct the error either. *See* Def. Response at 3-13. Only at oral argument did the Government acknowledge that the four price quotes in fact are contemporaneous with the period of review, and that the Second Remand Determination's statements to the contrary are in error. *See* Recording of Oral Argument at 1:48:50-1:50:22.

Interestingly, in the previous stage of the proceeding, although Commerce's Final Results correctly noted that the four price quotes are contemporaneous, the Government's brief incorrectly stated that they were not. *See* Taian Ziyang, 33 CIT at ____ n.57, 637 F. Supp. 2d at 1145 n.57 (*quoting* Government's brief); Issues and Decision Memorandum at 40 (noting that price quotes are contemporaneous).

[22]In the case at bar, for example, Commerce's determination of a surrogate value for jars and lids (like its determination of a surrogate value for cardboard cartons) involves a choice between

As to Commerce's asserted concerns about the "public availability" and "representativeness" of the domestic price quotes, the Second Remand Determination does little more than rehash the exact same points that were made in the Final Results (and found wanting in Taian Ziyang). *Compare* Second Remand Determination at 41-46, 75-76 *with* Issues and Decision Memorandum at 39-40. As the GDLSK Plaintiffs aptly observe, the Second Remand Determination largely "reiterates [Commerce's] . . . concerns about the unreliability of the price quotes," and "is comprised of virtually the identical arguments that [Taian Ziyang] has already found to be unsupported and inadequate." *See* GDLSK Comments at 3, 6.

As discussed below, in the course of the most recent remand, notwithstanding the questions raised in Taian Ziyang, Commerce apparently took no action to attempt to substantiate its assumption that the domestic price quotes are not accurate or to otherwise obtain any further information to try to verify their reliability, in order to address the agency's concerns about the

_____

domestic price quotes and Indian import statistics. But, unlike the price quotes for cardboard cartons, the price quotes for jars and lids are somewhat outside the period of review. *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1153. Similarly, in Jinan Yipin – which involves the eighth administrative review of the same antidumping duty order at issue here (*i.e.*, the administrative review immediately preceding this one) – the surrogate valuation of cardboard cartons was also disputed. But, unlike the price quotes for cardboard cartons in this case, the price quotes for cardboard cartons in Jinan Yipin were more than eight months beyond the period of review. *See* Jinan Yipin Corp. v. United States, 33 CIT ____, ____, 637 F. Supp. 2d 1183, 1195 (2009) ("Jinan Yipin II").

Commerce's error in the Second Remand Determination concerning the contemporaneity of the four price quotes here raises the possibility that the agency may not be exercising sufficient care to consider each issue and each case separately and independently, on its unique facts. To be sure, the rule of law requires predictability, consistency, and uniformity in decisionmaking, and that similar cases be decided similarly. However, the rule of law also requires that Commerce take pains to ensure that each issue in each case is decided on the specific facts on the record of that case. "Cut-and-paste" decisionmaking and "cookie cutter" justice are not permissible.

potential for "manipulation" which is the basis for the agency's preference for publicly available

data.  Similarly, in the course of the remand, notwithstanding the questions raised in <u>Taian Ziyang</u>,

Commerce apparently took no action to obtain any further information to clarify the extent to which

the domestic price quotes in fact reflect "broad market averages" and are sufficiently representative

of prices over "a substantial period of time" – specifically, prices over the one-year period that

constitutes the period of review.  In addition, Commerce apparently took no action to attempt to

ascertain the extent to which the price of basic cardboard packing cartons fluctuated during the

period of review at issue here, or even the extent to which the price historically has fluctuated over

time.  As such, Commerce apparently took no action during the most recent remand to clarify the

"representativeness" of the four domestic price quotes on the record.[23]

### a.  "Public Availability" and Potential "Manipulation" of Price Quotes

In the Second Remand Determination, Commerce reiterates its preference for "publicly

available information," explaining once again that the purpose underlying that preference is "to

reduce the possibility of manipulation."  *See* Second Remand Determination at 43; *see also id.* at

---

[23]Like the Final Results, the Second Remand Determination too made no reference to Commerce's general preference for the use of domestic data, rather than import statistics, which was discussed in <u>Taian Ziyang</u>.  *See* <u>Taian Ziyang</u>, 33 CIT at ____ & nn.60-61, 637 F. Supp. 2d at 1148 & nn.60-61 (discussing preference for domestic data); *see also* GDLSK Comments at 3, 5-6, 9.  The Government seeks to remedy Commerce's omission by discussing the matter in its brief.  *See* Def. Response at 8.  But the Government's analysis constitutes impermissible *post hoc* rationalization. *See, e.g.*, <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168-69 (1962) (explaining that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); <u>State Farm</u>, 463 U.S. at 50 (stating that "[i]t is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself").  In weighing the merits of the domestic price quotes (particularly as compared to the Indian import data), Commerce must acknowledge and address the agency's stated preference for domestic data and its implications for this case.

46 (referring to "the potential for manipulation"); *id*. at 76 (same); Def. Response at 7 (referring to

"the possibility that . . . data has been manipulated").  However, Commerce ignores <u>Taian Ziyang</u>'s

observation that no party – not even the Domestic Producers – has even alleged, much less adduced

any evidence to seek to prove, that the price quotes at issue here are distorted or are the product of

any manipulation, or are tainted by any affiliation between the requester of the price quotes and the

supplier, or any other potential conflict of interest or collusion.  *See* <u>Taian Ziyang</u>, 33 CIT at \_\_\_\_,

637 F. Supp. 2d at 1146-47; *see also* GDLSK Comments at 4 (arguing that "unfounded speculation"

concerning potential manipulation "remains an improper basis for Commerce's determinations").[24]

Moreover, as discussed above, much of the concern about price quotes expressed in the Final

Results (and in the Second Remand Determination) is not specific to the price quotes in this case,

---

[24]It is, of course, the Domestic Producers that have the incentive to challenge the price quotes
if they are not accurate.  Presumably, if the price quotes did not fairly reflect the price of cardboard
packing cartons throughout the period of review, the Domestic Producers would be the first to say
so.  Significantly, however, although the Domestic Producers placed the Indian import statistics on
the record of this proceeding, they have not sought to present any evidence suggesting that the
domestic price quotes on the record were manipulated or are in any way not representative.  Nor
have the Domestic Producers ever made any such claims.  It is also telling that the Domestic
Producers have not briefed this issue before the Court – not even in the prior stage of the proceeding.
*See* <u>Taian Ziyang</u>, 33 CIT at        n.55, 637 F. Supp. 2d at 1144 n.55 (noting that Domestic
Producers elected not to brief issue of valuation of cardboard cartons).  The Domestic Producers'
participation on this issue was similarly limited in the underlying administrative review.  *See* Issues
and Decision Memorandum at 38 (noting that the Domestic Producers filed no comments on issue
of cardboard cartons).

Finally, the very nature of the four domestic price quotes at issue here should serve to
assuage, at least to some degree, Commerce's concerns about "manipulation."  If one were inclined
to forge or manipulate price data, presumably one would produce data that were more clearly
decisive – in other words, one would generate a greater number of price quotes, and those price
quotes would span the full duration of the period of review.  Viewed through this lens, the
imperfections that Commerce sees in the price quotes are actually indicia of authenticity.

but, rather, is inherent in the nature of price quotes in general (and even inherent in other types of information that is not publicly available).[25]   Nevertheless, as <u>Taian Ziyang</u> observed, Commerce does not reject price quotes (and other information that is not publicly available) in all instances. To the contrary, Commerce has relied on non-publicly available information – including price quotes – in numerous other cases in the past.  *See* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1147.  Depending on the state of the record, "price quotes may reasonably be the best available information . . . for surrogate valuation purposes."  *See* <u>Vinh Quang Fisheries Corp. v. United States</u>, 33 CIT ____, ____, 637 F. Supp. 2d 1352, 1358 (2009) (rejecting respondent's argument that "a price quote never meets [Commerce's] standards and cannot be used because price quotes are inherently flawed and unreliable privately sourced data," in case where Commerce relied on two price quotes submitted by domestic producers, dated on two sequential days (rather than import statistics advocated by respondent)).

Yet, notwithstanding the points raised in <u>Taian Ziyang</u>, the Second Remand Determination fails to articulate a satisfactory explanation as to why the agency relies on price quotes and other information that is not publicly available in some cases, but not in others (and not in this case). Commerce has pointed to nothing that sets forth – for the benefit of domestic producers and respondents, as well as agency personnel, the courts, and the public at large – clear, established criteria that the agency consistently, uniformly, and systematically applies in determining when price quotes and other information that is not publicly available are acceptable for use in determining

---

[25]*See* Second Remand Determination at 46 (referring to "the problems inherent with price quotes" in general).

surrogate values in NME cases, and when they are not.[26]

---

[26]Like the Final Results, the Second Remand Determination includes a laundry list of documentation that Commerce purports to require to establish the reliability of price quotes – documentation that apparently is missing from the record here. *Compare* Issues and Decision Memorandum at 39 *with* Second Remand Determination at 42-43 (faulting lack of "information detailing the requestor of the price quotes and . . . information on the companies providing the price quotes," lack of information indicating whether the price quotes were "prepared specifically upon request and not generated in response to a request made by the GDLSK respondents in the normal course of business," lack of "information as to the relationship between the GDLSK respondents and the providers of the price quotes," lack of "information about who requested the price quotes and under what circumstances the price quotes were obtained," lack of information to "indicate where the price quotes fall in the spectrum of price quotes . . . offered by the[] companies," lack of information indicating whether the price quotes were "manipulated" in any way, lack of information indicating whether the GDLSK Plaintiffs "selectively decide[d] to submit only those price quotes that are favorable . . . while not submitting all price quotes . . . [they] received," lack of "information on how the [price quotes] were obtained (including the sources and any adjustments that may have been made)," and lack of information "demonstrat[ing] that the submitted price quotes are representative of carton prices during the [period of review]"); *see also id.* at 75-76 (faulting lack of information indicating whether the price quotes "represent an actual arm's length price for a completed order of these boxes between unaffiliated parties").

There are at least two salient points to be made. First, a cursory review of cases in which Commerce has relied on price quotes and other non-publicly available information suggests that Commerce's practice has not been as consistent as the agency here suggests, and that – contrary to its representations in this case – Commerce has not necessarily required documentation such as that outlined above in other cases in the past. As but one example, in Vinh Quang, Commerce deemed the two price quotes submitted by the domestic producers to be publicly available information, despite the respondent's claims to the contrary, and although the basis for Commerce's characterization is not clear from the record. *See, e.g.*, Vinh Quang, 33 CIT at ____, ____, 637 F. Supp. 2d at 1355, 1357. Even the domestic producers in that case did not claim that the price quotes were publicly available information. *See id.* at 1355 (noting that, in submitting price quotes, domestic producers explained that they were "unable to obtain public prices").

And, second, Commerce apparently made no effort in the course of the most recent remand to seek to obtain any of the information outlined above – information which, according to Commerce, would enable it to "assess the accuracy [and] completeness" of the quotes, and to "confirm that the submitted price quotes are representative of carton prices during the [period of review]," and thus would help resolve both the agency's concerns about the "representativeness" of the price quotes and the agency's reservations concerning the fact that price quotes in general – including the price quotes at issue here – are not information that is typically "publicly available."

     **b.** <u>"Representativeness" of Price Quotes and Potential "Temporary Market Fluctuations"</u>

The Second Remand Determination's treatment of the issue of the "representativeness" of the domestic price quotes is no more satisfying than its discussion of "public availability." *See* GDLSK Comments at 4 (noting, *inter alia*, that Second Remand Determination "makes the same assertion" of susceptibility to temporary market fluctuations as the Final Results, "without any factual basis"); *see generally* Second Remand Determination at 43-44, 75-76.

Once again, Commerce simply repeats the Final Results' broad, generalized pronouncements about the virtues of "surrogate values that reflect broad market averages" and "cover a substantial period of time," and then reiterates its position that the price quotes here "do not represent broad market averages" and "are not representative of prices throughout the [period of review]" – without even acknowledging the points and questions raised in <u>Taian Ziyang</u>. *See* Second Remand Determination at 43-44, 75-76; *compare* Issues and Decision Memorandum at 39-40 (same); *see generally* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1145-46 (analyzing and criticizing Final Results' discussion of "representativeness" of four domestic price quotes at issue here).[27]

---

*See* Second Remand Determination at 43.

[27]The Second Remand Determination seems to reflect concern only about temporal representativeness (and the potential for "temporary price fluctuations"), which is also the focus of the analyses in most other judicial decisions and administrative determinations in which representativeness has been an issue. *See, e.g.*, Second Remand Determination at 43 (stating that domestic price quotes were rejected because, *inter alia*, they are "not representative of prices throughout the [period of review]"); *id.* (stating that "the record does not demonstrate that the submitted price quotes are representative of carton prices during the [period of review]"); *id.* at 44 (stating that agency "has historically chosen to use surrogate values that reflect broad market averages and that cover a substantial time period over price data that are obtained from so isolated a time frame as to be subject to temporary market fluctuations"); *id.* at 46 (asserting that Indian

In the Second Remand Determination, Commerce makes the claim that, because the four domestic price quotes in this case are dated within two days of one another, the price quotes are "*highly susceptible* to temporary market conditions."  *See* Second Remand Determination at 43-44 (emphasis added); *see also* Def. Response at 5 (same); Issues and Decision Memorandum at 40 (expressing concern that price quotes might reflect "temporary market fluctuations").[28]  In support of Commerce's position on the preferability of "surrogate values that reflect broad market averages and that cover a substantial period of time" over price quotes that may be "subject to temporary market fluctuations," the Second Remand Determination and the Government once again cite

---

import statistics are preferable to domestic price quotes because import statistics are "representative of a range of prices throughout the [period of review]"); *id*. at 75 (stating that price quotes "do not represent broad market averages and do not reflect prices during the [period of review]").  In the Final Results, however, Commerce asserted that the Indian import statistics "represent[] the best available information on the record" because, *inter alia*, the statistics "are not specific to one region within India."  *See* Issues and Decision Memorandum at 38.  Thus, while the analysis herein focuses on temporal representativeness, the record is unclear as to whether geographic representativeness is also at issue in this case (although the four domestic price quotes are from four different cities).  *See* GDLSK Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 157), Exh. 16 (domestic price quotes for cardboard packing cartons).

[28]In the Second Remand Determination, Commerce has turned up the volume on its rhetoric.  In the Final Results, Commerce stated simply that the price quotes "could easily be subject to temporary market conditions."  *See* Issues and Decision Memorandum at 40.  Now, in the Second Remand Determination, Commerce maintains that the price quotes in this case are "*highly susceptible* to temporary market conditions."  *See* Second Remand Determination at 43-44 (emphasis added).  As discussed herein, however, there is no apparent basis in logic – and clearly no basis in the evidentiary record – to support either of Commerce's assertions.

As Taian Ziyang noted, the record is devoid of any evidence of price fluctuation.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1146.  Commerce added nothing to the record in the course of the most recent remand to substantiate even its original assertion that the price of basic cardboard packing cartons "could easily be subject to temporary market conditions" or "temporary market fluctuations."  *See* Issues and Decision Memorandum at 40.  Certainly there is no evidence to support Commerce's claim that the price quotes here are "highly susceptible" to such fluctuation.

Shrimp from Vietnam.  *See* Second Remand Determination at 44 (discussing Shrimp from Vietnam,

69 Fed. Reg. 42,672, 42,684, *unchanged in* Final Determination of Sales at Less Than Fair Value:

Certain Frozen and Canned Warmwater Shrimp From the Socialist Republic of Vietnam, 69 Fed.

Reg. 71,005 (Dec. 8, 2004)); Def. Response at 5 (same).  As <u>Taian Ziyang</u> noted, however, the

record in Shrimp from Vietnam included affirmative evidence of price fluctuations.  *See* <u>Taian</u>

<u>Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1146 (discussing Shrimp from Vietnam).  In stark

contrast, in this case, there is not even an *iota* of evidence that the price of basic cardboard packing

cartons was subject to any significant fluctuation whatsoever over the course of the period of review

– much less evidence that prices were (as Commerce now asserts) "highly susceptible" to such

fluctuation.  *See id.*[29]  Commerce's statement in the Second Remand Determination is thus nothing

more than bald speculation.  It does not even necessarily comport with common sense.

---

[29]In the Second Remand Determination, Commerce asserts for the first time that the notation on one of the four price quotes indicating that the quote is "only valid for a limited time" constitutes evidence that the price of cardboard packing cartons is subject to fluctuation.  *See* Second Remand Determination at 44; *see also* Def. Response at 5, 7.  However, there is nothing to indicate that the notation is anything more than standard contract "boilerplate."  And, in any event, the notation is far too flimsy and far too little to constitute the "substantial evidence" required to support a Commerce finding that prices were subject to significant fluctuation.

The Second Remand Determination also asserts for the first time that only two of the four price quotes are "legible."  *See* Second Remand Determination at 44; *see also* Def. Response at 5. But it is much, much too late in the day for Commerce to raise that concern.  At this advanced stage of the proceeding, Commerce simply cannot now be heard to raise such a complaint, which, in any event, presents interesting questions as to exactly how the agency analyzed, and then rejected, evidence that it now claims it cannot read.

In other words, it seems reasonable to assume that some commodities (or factors of production) fluctuate in price, seasonally and/or in response to established market forces such as supply and demand.  It is common knowledge, for example, that agricultural produce prices generally tend to fluctuate based on seasonal availability, and that mineral prices may fluctuate in accordance with supply and demand.  On the other hand, it is not at all obvious why the price of basic cardboard packing cartons would be subject to appreciable fluctuation over the course of a single year (*i.e.*, the period of review).  And, contrary to Commerce's assertions in the Second Remand Determination, it is certainly not obvious why the price of basic cardboard packing cartons would be "*highly* susceptible" to fluctuation.  *See* Second Remand Determination at 43-44 (emphasis added); *see also* Def. Response at 5.

As the "master of antidumping law" and the nation's institutional repository of expertise in the economics of trade, Commerce cannot here turn a blind eye to the realities of the business world, and make the unreasonable, wooden assumption that the prices of all commodities or factors of production are subject to significant fluctuation over the period of review.  Such a blanket presumption defies logic and common sense, and is at odds with the agency's fundamental obligation "to determine antidumping margins 'as accurately as possible.'"  *See*, *e.g.*, Jinan Yipin Corp. v. United States, 31 CIT 1901, 1937, 526 F. Supp. 2d 1347, 1379 (2007) ("Jinan Yipin I") (holding that, "absent evidence of significant price fluctuation in a short time," Commerce not permitted to reject price quotes for cardboard cartons used to pack garlic as not sufficiently "representative," even though price quotes not only were all dated within a single month, but also

post-dated period of review by more than eight months)[30]; Thai Pineapple, 187 F.3d at 1365;

Shakeproof, 268 F.3d at 1382 (citation omitted).

Where, as here, Commerce admits that there are distortions in the price data that the agency

seeks to use, Commerce cannot reasonably rely on mere assumptions alone (*i.e.*, the assumption that

non-public price information is the product of manipulation, and the assumption that prices fluctuate

significantly over the period of review) to establish that the alternative data are also distorted.  In

such cases, actual proof of distortion is required.

5.  The Second Remand Determination's Treatment of the Indian Import Statistics

As outlined above, the Second Remand Determination's response to Taian Ziyang's analysis

of the Final Results' treatment of the domestic price quotes is far from satisfactory.  But, by

comparison, the Second Remand Determination's response to Taian Ziyang's criticisms of the

Indian import statistics is all but non-existent.  The Second Remand Determination is almost entirely

silent on the concerns that Taian Ziyang raised as to the serious problems that plague the Indian

import statistics on which Commerce relied in the Final Results, and on which the agency continues

---

[30]*See also*, *e.g.*, Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1159 (explaining that "Commerce is not free to predicate its surrogate value determinations on unexplained and seemingly unreasonable assumptions"; remanding issue of surrogate value for ocean freight charges with instructions requiring agency to explain and provide record support for its "questionable assumption that the respondents used such a long, circuitous, and more expensive route to ship their garlic to the United States"); Jinan Yipin I, 31 CIT at 1933, 526 F. Supp. 2d at 1375 (holding that, absent record evidence to support the fact, Commerce cannot presume that Indian garlic producers "typically irrigate their garlic crops using water supplied by municipal utilities, at costs associated with such utilities"); Yantai Oriental, 26 CIT at 617 (holding that, absent supporting evidence and explanation, Commerce cannot presume that producers would use more expensive imported coal when domestic coal is available).

to rely in the Second Remand Determination.  *Compare* Second Remand Determination at 42, 45-46, 75 *with* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1147-52; *see* GDLSK Comments at 3 (noting that the Second Remand Determination "has largely ignored [Taian Ziyang's] criticisms of the Indian import statistics values and has continued to rely upon the same reasoning and arguments . . . previously found to be unsatisfactory").

As the GDLSK Plaintiffs correctly point out, the Second Remand Determination "offers absolutely no new information or explanation as to why [Commerce's] continued use of the[] unrepresentative import prices should be found reasonable." *See* GDLSK Comments at 5; *see also* GDLSK Reply Comments at 2-3 (same).  Nothing in the Second Remand Determination responds to the concerns expressed in Taian Ziyang about the Indian import statistics' lack of product specificity.  *See* Taian Ziyang, 33 CIT at ____, ____, 637 F. Supp. 2d at 1149-50, 1152.[31]

---

[31]In the Second Remand Determination, Commerce notes that the trade intelligence data submitted by the GDLSK Plaintiffs "indicat[e] that Indian HTS 4819.1001 included certain specialty packing products they [*i.e.*, the GDLSK Plaintiffs] *claim* not to have used." *See* Second Remand Determination at 42 (emphasis added).  But that ship has long since sailed.  It is too late for Commerce to equivocate on whether the Indian import statistics are distorted by the inclusion of gift and specialty boxes and other more expensive products that are unlike the basic cardboard packing cartons at issue here.  That distortion is an undisputed record fact.  The open questions are the extent and the significance of that distortion.

In the Final Results, Commerce acknowledged that, while the Chinese producers use "boxes within this Indian HTS category . . . (*e.g.*, 5-ply 10 by 14 cardboard)," the HTS subheading also encompasses "many different types of boxes," including gift and specialty boxes, in addition to basic cardboard packing cartons.  *See* Issues and Decision Memorandum at 38-39; *see also* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1149 (noting that it is "undisputed" that Indian import statistics cover "gift, specialty, and other non-packing boxes" in addition to plain cardboard packing cartons).  Indeed, elsewhere in the Second Remand Determination itself, Commerce concedes (as it must) that Indian import data "do not perfectly represent . . . [the basic cardboard packing cartons] of the GDLSK respondents because the import data include specialty boxes," and that the import data are thus "less specific" than the domestic price quotes.  *See* Second Remand Determination at 45, 75.

Commerce has made no attempt to address the trade intelligence data placed on the record by the

GDLSK Plaintiffs, or to otherwise ascertain the extent to which the values reflected in the Indian

import statistics are inflated by the inclusion of apparently vast quantities of more expensive

specialty products that bear no resemblance to the basic cardboard packing cartons used by the

Chinese producers here.   *See* GDLSK Comments at 3 (noting that the Second Remand

Determination "again fails to address adequately . . . the distortions caused by the lack of specificity

of the import statistics"); *id*. at 9 (same); GDLSK Reply Comments at 3.[32]

---

Commerce cannot now argue to the contrary.

[32]The GDLSK Plaintiffs also assert that Commerce's rejection of the much more "product specific" price quotes for cardboard packing cartons is undermined by Commerce's emphasis on the importance of product specificity in the agency's valuation of garlic seed.  *See* GDLSK Comments at 6; *see also* Second Remand Determination at 4-8, 54-58 (discussing valuation of garlic seed); Issues and Decision Memorandum at 14-22 (same).  According to the GDLSK Plaintiffs, "the two conflicting positions Commerce takes with respect to garlic seed and cartons cannot be reconciled and demonstrate that its findings [as to the valuation of cardboard cartons] . . . are arbitrary."  *See* GDLSK Comments at 6.  The Government contends that the GDLSK Plaintiffs "waived the right to raise this argument before this Court" because the argument was not made during the remand proceedings, although the Government concedes that the argument was raised in the course of the underlying administrative proceeding.  *See* Def. Response at 13 & n.1; *see also* Issues and Decision Memorandum at 38 (noting GDLSK Plaintiffs' argument that Commerce "cannot select a domestic garlic seed surrogate value on the basis of being 'more product specific,' while at the same time rejecting another domestic price to value a different [factor of production]" – *i.e.*, cardboard cartons).

In any event, the antidumping statute "merely requires the use of the 'best available information' with respect to the valuation of a given factor of production; it does not require that a uniform methodology be used in the valuation of all relevant factors."  *See* Nation Ford, 166 F.3d at 1378 (rejecting claim that, because Commerce used Indian domestic prices in its valuation of one factor of production, the agency was required to use Indian domestic prices for other values in the case).  There is therefore no merit to the GDLSK Plaintiffs' suggestion that Commerce's emphasis on product specificity in the valuation of garlic seed governs the agency's valuation of cardboard packing cartons.  On the other hand, as discussed in greater detail below, product specificity is clearly a key criterion in determining the "best available information" for use in valuing factors of

Similarly, nothing in the Second Remand Determination responds to the concerns expressed in Taian Ziyang about the air freight costs reflected in the values derived from the Indian import statistics on which Commerce relies.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1150-51; GDLSK Comments at 7, 9.  Commerce now clearly concedes that the Indian import data are distorted by the inclusion of air freight costs.  *See* Second Remand Determination at 75 (noting that the agency "acknowledges the fact that the [import statistics] do not perfectly represent the inputs of the GDLSK respondents because the Indian import data include . . . boxes transported by air").[33] Nevertheless, Commerce made no attempt on remand to ascertain the volume of merchandise reflected in the Indian import statistics that was imported by air, or to otherwise demonstrate that the values reflected in the Indian import statistics are not significantly inflated by the inclusion of air freight costs.

The entirety of the Second Remand Determination's defense of the Indian import statistics amounts to a series of conclusory assertions (discussed in greater detail below), coupled with

_____

production, including the cardboard cartons at issue here.

[33]In the Final Results, Commerce appeared to quibble about whether the cardboard cartons used by the Chinese producers were imported by air, or were sourced domestically as the GDLSK Plaintiffs have maintained.  *See, e.g.*, Issues and Decision Memorandum at 40 (asserting that the GDLSK Respondents had not "demonstrate[d] that their own domestic carton suppliers did not import some products into the PRC by air").  And, even though (in the statement quoted above) Commerce has now clearly conceded that air freight charges inflate the values derived from the import statistics (*see* Second Remand Determination at 75), the Second Remand Determination elsewhere seems to try to continue to hedge.  *See* Second Remand Determination at 46 (stating that "the data obtained through Indian import statistics *may not* perfectly represent the inputs used by the GDLSK respondents because the Indian import data include . . . boxes transported by air") (emphasis added); *see also id.* at 42 (stating that "the GDLSK respondents *claim* that [the Indian import statistics] include[] products that, unlike those that the GDLSK respondents used, were shipped by air") (emphasis added).

Commerce's broad claim that "it is within [the agency's] discretion to choose Indian import data . . . over domestic, respondent-submitted price quotes." *See* Second Remand Determination at 44. To be sure, Commerce enjoys broad discretion in valuing factors of production and ascertaining the "best available information." *See*, *e.g.*, Shakeproof, 268 F.3d at 1381.  However, that does not mean that the agency's choice between Indian import data and domestic price quotes is immune from judicial review.  Commerce's discretion notwithstanding, "a surrogate value must be as representative of the situation in the [non-market economy] country as is feasible." *See* Nation Ford, 166 F.3d at 1377 (internal quotation marks and citation omitted).  The role of the courts in a case such as this is to ask – and to answer – what the Court of Appeals has termed "the critical question": whether Commerce's valuation of the factors of production is "based on the *best available information* and establishes antidumping margins *as accurately as possible*." *See* Ningbo, 580 F.3d at 1257 (emphases added) (internal quotation marks and citation omitted).  Thus, contrary to Commerce's implication in the Second Remand Determination, the agency's discretion here is by no means unfettered.

In an attempt to support its claim that "it is within [Commerce's] discretion to choose Indian import data . . . over domestic, respondent-submitted price quotes," the Second Remand Determination cites two authorities – Synthetic Indigo from the PRC, and Jinan Yipin II.  *See* Second Remand Determination at 44-46 (discussing Synthetic Indigo from the PRC, 68 Fed. Reg. at 53,711, and Jinan Yipin Corp. v. United States, 33 CIT ____, ____, 637 F. Supp. 2d 1183, 1196 (2009) ("Jinan Yipin II")).  But those authorities are inapposite.

The Second Remand Determination's citation of Synthetic Indigo from the PRC brings nothing new to the analysis in this case.  As section III.E.1 above notes, Synthetic Indigo was discussed in both the Final Results and in <u>Taian Ziyang</u>.  *See* Issues and Decision Memorandum at 40; <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1145-46; section III.E.1, *supra*.  Moreover, the Second Remand Determination's discussion of Synthetic Indigo flatly misrepresents the facts of that case and ignores the discussion in <u>Taian Ziyang</u>.  Specifically, in the Second Remand Determination, Commerce states that the price quotes in Synthetic Indigo "suffered from the same flaws as the price quotes in this review."  *See* Second Remand Determination at 45.  But, quite to the contrary, as <u>Taian Ziyang</u> explained (and as discussed above), the price quotes in Synthetic Indigo "were dated anywhere from seven to ten months after the end of the [period of review]" – while the price quotes at issue here are fully contemporaneous with the period of review.  *See* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1145-46 (*quoting* Issues and Decision Memorandum at 40).[34]

---

[34]Inexplicably, the Government states in its brief that, in Synthetic Indigo from the PRC, "Commerce rejected the price quotes [in that case] because it was unable to determine whether [the price quotes] were representative of the range of prices . . . during the period of review."  *See* Def. Response at 9.  The Government argues that "[s]imilarly in this case, Commerce rejected the price quotes because, in part, [the GDLSK Plaintiffs] failed to meet [their] burden of establishing that the price quotes represented a broad market average during the period of review."  *See id*.

Either the Government did not read Synthetic Indigo from the PRC, or the Government is being less than fully candid with the court.  The Issues and Decision Memorandum in Synthetic Indigo makes it clear that Commerce's foremost concern about the price quotes there was that the price quotes were "dated from seven to ten months after the end of the [period of review]" – a key fact that the Government significantly failed to note in its brief here.  *See* Issues and Decision Memorandum for Synthetic Indigo from the PRC, 2003 WL 24153859 (ITA), at Comment 11.  Thus, contrary to the Government's claims, this case is readily distinguished from Synthetic Indigo from the PRC.

The Second Remand Determination's discussion of <u>Jinan Yipin II</u> is similarly misleading. In the Second Remand Determination, Commerce suggests that this case and <u>Jinan Yipin II</u> are close parallels, and intimates that the price quotes in that case were rejected in favor of Indian import statistics for the same reasons that Commerce has given in this case.  *See* Second Remand Determination at 44-45.  But what Commerce strategically fails to disclose is that the price quotes in <u>Jinan Yipin II</u> – like the price quotes in Synthetic Indigo from the PRC, but unlike the price quotes at issue here – were from outside the period of review.  *See* <u>Jinan Yipin II</u>, 33 CIT at ____, 637 F. Supp. 2d at 1195 (noting that price quotes in that case "were eight months after the close of the period of review"); *see also* GDLSK Comments at 6-7.[35]  In other words, without regard to the numerous other facts distinguishing the three cases from one another, the price quotes in Synthetic Indigo from the PRC and <u>Jinan Yipin II</u> differ from the price quotes at issue here in at least one respect – the price quotes in this case are contemporaneous, while those in the two cases that Commerce cites were not.

In an effort to defend the agency's reliance on the Indian import statistics, Commerce and the Government seek to cast the case at bar as a case where the agency is confronted with a choice

[35]While the decision may be somewhat (as the Government puts it) "instructive," the significance of <u>Jinan Yipin II</u> for this case is limited for other reasons as well, in addition to those outlined above.  *See* Def. Response at 11-13.  As the GDLSK Plaintiffs emphasize, for example, "[e]ach proceeding has its own record," and Commerce's determination in this case must be judged solely on the record compiled here.  *See* GDLSK Comments at 6.  In addition, the GDLSK Plaintiffs correctly note that "the import data and the trade intelligence data from <u>Jinan Yipin II</u> corresponds to a different time period and, therefore, is based upon entirely different entries.  Consequently, the degree to which the trade intelligence data demonstrates that the import data does not consist of the type of cartons used by the garlic producers for each case is entirely unrelated.  For example, unlike this case, the trade intelligence data in <u>Jinan Yipin II</u> overlapped but did not correspond with the [period of review] exactly."  *See* GDLSK Comments at 7.

between two imperfect sets of data.  *See*, *e.g.*, Second Remand Determination at 44 (arguing that "it is within [Commerce's] discretion to choose between two imperfect data sources").[36]  But that is not an accurate depiction of the current state of the administrative record here.

Commerce candidly admits that the Indian import statistics are "imperfect" – that is, that the import statistics reflect inflated values as a surrogate for the input in question here – both because the import statistics include more expensive gift and specialty boxes that are unlike the basic cardboard packing cartons used by the Chinese garlic producers in this case (such that the import statistics are not "product specific") and because, although garlic producers use domestic packing cartons, the import statistics include air freight charges for boxes imported by air.  *See* Second Remand Determination at 75.[37]  On the other hand, based on the record as it currently stands, the domestic price quotes are "imperfect" only in the sense that it has not been established to Commerce's satisfaction that the price quotes were not manipulated and that the price quotes are sufficiently "representative" of prices throughout the period of review.  In other words, in contrast to the Indian import statistics (which are admittedly "imperfect"), there is no affirmative evidence that the domestic price quotes are in any way "imperfect."

Simply stated, Commerce here has chosen *admittedly* distorted data over data that the agency speculates may be *potentially* distorted.  Or, to state it a little differently, Commerce here has chosen

---

[36] *See also* Def. Response at 12 (analogizing instant case to <u>Jinan Yipin II</u>, in context of argument that Commerce has discretion to choose between "two imperfect data sets"); *id*. at 5-6.

[37] Commerce now "acknowledges the fact that the [import statistics] do not perfectly represent the inputs of the GDLSK respondents because the Indian import data include [1] specialty boxes, and [2] boxes transported by air."  *See* Second Remand Determination at 75.

*admittedly distorted* Indian import statistics over *potentially "perfect"* price quotes. And Commerce apparently has done so without conducting any analysis (not even a qualitative analysis, much less a quantitative one) to determine the extent of the *actual* distortion of the import statistics, for comparison to the extent to which (according to Commerce) the domestic price quotes might *potentially* be distorted. As such, Commerce's choice of the Indian import statistics over the domestic price quotes is not rational and lacks any basis in the record.

Other than Commerce's claim that the choice between import statistics and domestic price quotes is a matter of agency discretion, all that remains of the Second Remand Determination's defense of its decision to rely on the Indian import statistics in this case is a series of unsupported, conclusory assertions about the shortcomings of the domestic price quotes, and the relative merits of the two sets of data. The Second Remand Determination states, for example, that Commerce "considers the problems inherent with price quotes, and the specific deficiencies of the price quotes submitted for this review . . . to be *far more problematic*" than the Indian import data. *See* Second Remand Determination at 46 (emphasis added). To the same effect, elsewhere in the Second Remand Determination Commerce states that, "[a]s long as there are other data sources on the record that, overall, *better meet* [*Commerce's*] *criteria* . . . , [Commerce] is obliged to use *the better data source* over price quotes as a surrogate value." *See id*. at 45 (emphases added). The two statements, on their face, purport to be comparisons of the relative merits of the domestic price quotes *versus* the Indian import statistics. However, as discussed above, the record is devoid of any true comparative analysis of the two sets of data. Indeed, a line-by-line review of both the Second Remand Determination and the Final Results reveals that there is no basis whatsoever in the record

for Commerce's statements.

The Second Remand Determination similarly reiterates the Final Results' determination that the Indian import statistics "are the *best available information* with which to value . . . cartons in this proceeding." *See* Second Remand Determination at 76 (emphasis added); *see also id.* at 46 (stating that Commerce "continues to find the import statistics to be the *best available information*") (emphasis added); Issues and Decision Memorandum at 38, 40.  But, again, such statements are inherently relative assessments – conclusions that reflect a comparative analysis of the domestic price quotes and the Indian import statistics.  As outlined above, however, Commerce has failed to conduct any true comparative assessment of the two sets of data.  As such, Commerce's determination that the Indian import statistics constitute the "best available information" remains unexplained, and finds no support in the existing administrative record.[38]

Finally, as outlined above, Commerce's assertion that the situation here involves a choice between two "imperfect" sets of data does not fairly depict the administrative record as it currently stands; and it is more accurate at present to describe the two competing sources of information as *admittedly distorted* Indian import statistics versus *potentially accurate* domestic price quotes.  But

---

[38]The Second Remand Determination's discussion of the valuation of cardboard packing cartons is replete with unsupported conclusory assertions.  As yet another example, the Second Remand Determination states that "the product specificity of the price quotes does not overcome the problems with this data source [*i.e.*, the price quotes]."  *See* Second Remand Determination at 75. The Government's brief is full of similar unsupported and conclusory statements.  For example, the Government asserts that "Commerce reasonably selected the *more reliable* evidence . . . to calculate . . . [the] surrogate value for cardboard cartons."  *See* Def. Response at 8 (emphasis added).  But nowhere does the Government explain how Commerce could possibly conclude on the existing record that *admittedly* distorted data (*i.e.*, the import statistics) are more reliable than the alternative data (*i.e.*, the domestic price quotes), which are (at worst) *potentially* distorted.

even if the record established conclusively that the price quotes were "imperfect," Commerce's Second Remand Determination nevertheless still could not be sustained.

Commerce is not permitted to select a surrogate value by default. In other words, the agency cannot justify its selection of one data source (*i.e.*, the Indian import statistics) merely by pointing to asserted problems with the other data source (*i.e.*, the domestic price quotes). As the GDLSK Plaintiffs correctly observe, Commerce "cannot support its findings merely by citing the perceived shortcomings of the value [that] it rejected while largely ignoring the infirmities of the value [that] it did select." *See* GDLSK Reply Comments at 5 (citation omitted). "Commerce's analysis must do more than simply identify flaws in the data sets it rejects." Guangdong Chems. Imp. & Exp. Corp. v. United States, 30 CIT 1412, 1417, 460 F. Supp. 2d 1365, 1369 (2006). "Even where a party opposing Commerce's position has submitted information that ultimately proves inadequate, Commerce is not relieved of the requirement that it support its antidumping duty calculation with substantial evidence." Hebei Metals & Minerals Imp. & Export Corp. v. United States, 28 CIT 1185, 1193 & n.3 (2004) ("Hebei Metals I") (*citing* 19 U.S.C. § 1516a(b)(1)(B)).[39]

Thus, contrary to the implications of Commerce and the Government, the agency is not free to simply choose at will between imperfect sets of data. *See* Second Remand Determination at 44; Def. Response at 5-6, 12. Even in situations where all potential sources of data on the record have

---

[39]*See also* Hebei Metals II, 29 CIT at 295 n.3, 366 F. Supp. 2d at 1270 n.3 (same); Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1154-55 (explaining that, "as the case law amply demonstrates, the mere fact that domestic data provided by a respondent are less than perfect does not necessarily warrant their rejection (in whole or in part). Nor do flaws in such data automatically justify resort to import statistics which are plagued by other infirmities which are equally, if not more, serious") (emphasis omitted).

flaws (a not uncommon occurrence), the law requires Commerce to make a reasoned decision as to

the source on which it chooses to rely, and to both adequately explain its rationale and support its

decision by reference to substantial evidence in the record.[40]  In short, as the GDLSK Plaintiffs note,

Commerce's statutory obligation in this instance is no different than in any other investigation or

review: Commerce must "calculate dumping margins as accurately as possible" by "making a fair

and equal comparison of competing surrogate values," and by supporting its determination with

valid findings supported by substantial evidence and an adequate rationale.  *See* GDLSK Reply

Comments at 5.[41]

### 6.  Additional Issues

As explained above in the introduction to section III, Policy Bulletin 04.1 outlines certain

criteria that Commerce considers in determining the "best available information" to use in

determining surrogate values.  *See*, *e.g.*, Second Remand Determination at 42; section III, *supra*.

---

[40]Moreover, "Commerce has certain core investigatory duties, which cannot be avoided."
*See* Hebei Metals II, 29 CIT at 295, 366 F. Supp. 2d at 1270.  Thus, if the record in a case is such
that none of the data sources on record is sufficient to permit Commerce to *reasonably* rely on it,
Commerce is not permitted to choose "the lesser of the evils."  The statute "does not permit
Commerce to choose between two *unreasonable* choices, *i.e.*, two surrogate values that have an
unexplained relation" to the input that the agency is valuing.  *See id*. (emphasis added).  Instead, in
such a situation, Commerce is required to further develop the record  – by, for example,
supplementing the record with data from another source, if necessary.

[41]*See also*, *e.g.*, Jinan Yipin II, 33 CIT at ____, 637 F. Supp. 2d at 1196 (explaining that "it
is for Commerce to decide between two imperfect data sets, *provided that decision is supported by
valid findings and adequate reasoning*") (emphasis added); Allied Pacific Food (Dalian) Co. v.
United States, 30 CIT 736, 757, 435 F. Supp. 2d 1295, 1313-14 (2006) ("Allied Pacific I") (stating
that Commerce is required to "conduct a fair comparison of the data sets on the record" to select
surrogate value data that yield most accurate dumping margin).

Specifically, Policy Bulletin 04.1 reflects Commerce's preference for the use of "investigation or review period-wide price averages ['representativeness'], prices specific to the input in question ['product specificity'], prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review ['contemporaneity'], and publicly available data."  *See* Policy Bulletin 04.1.  There are, however, several flaws in the way that Commerce and the Government have applied the criteria set forth in Policy 04.1 in determining a surrogate value for cardboard cartons in this case.

For example, the Government states in its brief that the Indian import statistics are the "best available information" for use in valuing cardboard cartons because the import statistics "met more of Commerce's surrogate value selection criteria."  *See* Def. Response at 5.  The Government thus seems to suggest that the Indian import statistics constitute the "best available information" because – according to Commerce – the import statistics are "publicly available, contemporaneous with the [period of review], representative of a range of prices throughout the [period of review], and sufficiently specific to the product" (and therefore, according to Commerce, satisfy *four* criteria), while the domestic price quotes (although contemporaneous and more "product specific" than the import statistics) are – according to Commerce – "not publicly available" and "not representative of prices throughout the [period of review]" (and thus, according to Commerce, satisfy only *two* criteria).  *See* Second Remand Determination at 43, 45, 46.  Contrary to the Government's implication, however, determining the "best available information" is not a straightforward exercise in basic arithmetic.  The analysis is much more complex than simply tallying up the number of criteria satisfied by each potential data source, and then declaring the data source with the higher number the "best available information."

An even more serious flaw seems to pervade the Second Remand Determination, as well as the Final Results. Just as the Government errs to the extent that it suggests that the "best available information" in a case is necessarily the data source that satisfies the most criteria, it appears that Commerce errs in according equal weight to each of the criteria – or, at least, in giving far too little weight to "product specificity." All of the criteria outlined in Policy Bulletin 04.1 may be important. But they are not equally important. As a matter of pure logic, first among them must be "product specificity" (or, in the parlance of the Policy Bulletin, "prices specific to the input in question").

To illustrate the point with an extreme example, Commerce here could not reasonably base its surrogate value for cardboard packing cartons on Indian import statistics for fishing rods (for instance),[42] even if those import statistics – in the words of Policy Bulletin 04.1 – unquestionably reflected "review period-wide price averages" and were indisputably "publicly available data" that were fully "contemporaneous with the period of . . . review" and "net of taxes and import duties." Commerce could not do so because, even if the Indian import statistics for fishing rods were absolutely perfect in every other way, the import statistics would not be sufficiently "product specific." On the other hand, Commerce in the past has, on occasion, relied on data that were, for example, not "contemporaneous with the period of . . . review," or that did not satisfy some other criterion set forth in Policy Bulletin 04.1. *See*, *e.g.*, Sichuan Changhong Elec. Co. v. United States, 30 CIT 1481, 1503-04, 460 F. Supp. 2d 1338, 1358-59 (2006) (sustaining Commerce's selection of non-contemporaneous data, in lieu of contemporaneous data from another source, where non-contemporaneous data were more accurate than contemporaneous data).

_____

[42]Indian HTS heading 9507 covers fishing rods.

In sum, "product specificity" logically must be the primary consideration in determining "best available information."   If a set of data is not sufficiently "product specific," it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1.  *See*, *e.g.*, Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1273-74 (2005) ("Hebei Metals II") (explaining that, where agency failed to demonstrate Indian import statistics were sufficiently "product specific," it was irrelevant whether statistics satisfied other criteria, such as "contemporaneity").

As noted above, the Second Remand Determination asserts that the Indian import statistics here are "sufficiently specific to the product" – that is, "sufficiently specific" to the basic cardboard packing cartons used by the Chinese producers.  *See* Second Remand Determination at 46; *see also* Issues and Decision Memorandum at 38, 40 (same).   However, neither the Second Remand Determination nor the Final Results provides any explanation for that conclusory assertion.  Nor is the assertion supported by the administrative record as it presently exists.

Another significant underlying issue in this case is the parties' respective burdens of proof. The Government argues that the GDLSK Plaintiffs bear the burden of "provid[ing] record evidence establishing that the price quotes met Commerce's selection criteria for surrogate values."  *See* Def. Response at 6 (*citing* NTN Bearing Corp. v. United States, 997 F.2d 1453, 1458 (Fed. Cir. 1993)). It is true that, as a general principle, "[t]he burden of creating an adequate record lies with respondents and not with Commerce."  *See*, *e.g.*, Longkou Haimeng Mach. Co. v. United States, 33 CIT ____, ____, 617 F. Supp. 2d 1363, 1372 (2009).   However, what Commerce and the Government do not acknowledge is that the general principle that the respondent bears the burden

of proof is somewhat in tension with (and must be interpreted so as to be consistent with) the obligations imposed on Commerce by the antidumping statute.

The general principle that the respondent bears the burden of proof in no way relieves Commerce of the requirements that it value factors of production based on the "best available information" and that it establish antidumping margins "as accurately as possible." *See* <u>Ningbo</u>, 580 F.3d at 1257 (internal quotation marks and citation omitted). Further, while Commerce may not be obligated to help a respondent obtain information to support the surrogate value that the respondent advocates, "Commerce [is] required to obtain adequate evidence for the value it select[s]." *See* <u>Hebei Metals II</u>, 29 CIT at 296, 366 F. Supp. 2d at 1271. And Commerce cannot select a surrogate value by default. *See*, *e.g.*, <u>Guangdong Chems.</u>, 30 CIT at 1417, 460 F. Supp. 2d at 1369; <u>Hebei Metals I</u>, 28 CIT at 1193 & n.3.

In sum, a respondent is not absolved of the responsibility to make the case for the set of data that it favors. Thus, the GDLSK Plaintiffs here cannot wash their hands of all responsibility to adduce evidence showing that the domestic price quotes are not the product of manipulation and that they are generally representative of prices throughout the period of review. But, at the same time, Commerce's "core investigatory duties" require the agency to demonstrate affirmatively that each surrogate value that it selects satisfies the agency's statutory obligations to value factors of production based on the "best available information" and to establish antidumping margins "as accurately as possible," by providing a reasoned explanation for the agency's determination, anchored by substantial evidence in the administrative record. *See* <u>Hebei Metals II</u>, 29 CIT at 295-96, 366 F. Supp. 2d at 1270.

Here, it is not at all clear how Commerce can establish that the Indian import statistics are

the "best available information" if there are serious unanswered questions about the extent to which

the import statistics are distorted by the inclusion of gift and specialty boxes and other products that

are not comparable to the cardboard packing cartons at issue and about the extent to which the

import statistics are distorted by the inclusion of charges for air freight.  Similarly, depending on the

extent of the distortion reflected in the Indian import statistics, Commerce may or may not be able

to establish that the Indian import statistics are the "best available information" without determining

whether, in fact, the domestic price quotes were the product of manipulation and the extent to which

they are representative of prices throughout the period of review.[43]

---

[43]Just as Commerce and the Government have failed to confront the agency's obligation "to obtain adequate evidence for the value [the agency] select[s]," so too the GDLSK Plaintiffs have failed to respond directly to the Government's argument on burden of proof.  *See* Hebei Metals II, 29 CIT at 296, 366 F. Supp. 2d at 1271; Def. Response at 6-7 (criticizing GDLSK Plaintiffs for lack of "record evidence establishing that the price quotes met Commerce's selection criteria for surrogate values").  Nothing in Taian Ziyang (and, for that matter, nothing herein) should be read as relieving the GDLSK Plaintiffs of their burden of proof.

Optimally, the record as supplemented by the parties on remand will allow all issues to be resolved on the merits and based on affirmative evidence (rather than sorting out the issues of assumptions and burdens of proof).  However, if that is not possible, the GDLSK Plaintiffs, as well as Commerce and the Government, will have to address the state of the record as it then exists, including any potential issues such as the legitimacy of assumptions, and the parties' respective burdens of proof.

If Commerce could establish on remand that the inclusion of the more expensive products and the air freight charges have no significant distortive effect on the Indian import statistics, it might be possible to sustain the agency's determination that the import statistics constitute the "best available information" even without evidence on the potential for manipulation and the representativeness of the domestic price quotes.  Based on the breadth of the Indian HTS subheading and the existing record evidence on the Indian import statistics, that prospect seems unlikely at this time.  It is nevertheless worth underscoring that, on remand, both Commerce and the GDLSK Plaintiffs have incentives to develop the record on the domestic price quotes, as well as the import

7.  Conclusion

As detailed above, and as discussed at greater length in Taian Ziyang,  Commerce has failed to adequately explain the agency's determination that the Indian import statistics constitute the "best available information" for use in calculating the surrogate value of basic cardboard packing cartons, in light of the acknowledged infirmities in the import statistics.   Nor has Commerce adequately explained why the Indian import statistics are preferable to the domestic price quotes, the other source of information on the existing record.  *See generally* State Farm, 463 U.S. at 43 (explaining that agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'") (citation omitted); *see also* Timken, 421 F.3d at 1355 (stating that agency "must explain its action with sufficient clarity to permit 'effective judicial review'") (citation omitted); Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1151-52 (concluding that "Commerce failed to explain how the Indian import data is the 'best available information'").  The Second Remand Determination has done nothing to remedy the flaws in the Final Results outlined in Taian Ziyang.  Similarly, as detailed above and as discussed at greater length in Taian Ziyang, Commerce's determination that the Indian import statistics constitute the "best available information" (as compared to the domestic price quotes) is not supported by substantial evidence in the administrative record.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1152 (concluding that "Commerce failed to support its selection of the Indian import statistics by reference to substantial evidence in the record").  Thus, as to this issue,

_____

statistics.  Any party that ignores its burden of proof does so at its peril.

Commerce's Second Remand Determination cannot be sustained.

Because the Second Remand Determination's treatment of the valuation of cardboard packing cartons simply recycles the arguments that Commerce made in its Final Results, the GDLSK Plaintiffs urge "that this issue be remanded to Commerce with instructions to use the domestic price quotes for cartons." *See* GDLSK Comments at 9. Instead, the issue is remanded for further consideration not inconsistent with the analysis herein and in <u>Taian Ziyang</u>. Commerce is forewarned, however, that – having squandered this most recent remand – it is unlikely to get another bite at the apple on this issue.

On remand, Commerce shall reopen the record to evidence concerning the domestic price quotes and the Indian import statistics (as well as alternative sets of data, if any, that may be appropriate). Commerce shall accept further evidence from the GDLSK Plaintiffs, in addition to any information that the agency wishes to place on the record; and Commerce shall allow the GDLSK Plaintiffs sufficient time to submit further evidence, to respond to any information that the agency may place on the record, and to provide comments on the agency's draft results of the remand.

### F.  Valuation of Plastic Jars and Lids

In <u>Taian Ziyang</u>, the GDLSK Plaintiffs prevailed on their challenge to the Final Results' surrogate valuation of the plastic jars and lids used to pack garlic, on grounds that parallel the rationale on which the GDLSK Plaintiffs prevailed on cardboard packing cartons (discussed above) in several key respects. *See generally* <u>Taian Ziyang</u>, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1101-02, 1152-57, 1166; *see also* section III.E, *supra* (summarizing the treatment of cardboard

packing cartons in the Final Results and in <u>Taian Ziyang</u>).

As <u>Taian Ziyang</u> explained, the Final Results valued plastic jars and lids using a surrogate value derived from WTA import statistics for two broad "basket" provisions of the Indian HTS – specifically, HTS subheading 3923.3000 (covering "carboys, bottles, flasks and similar plastic items") and HTS subheading 3923.5000 (covering "stoppers, lids, caps and other closures of plastics"). *See* <u>Taian Ziyang</u>, 33 CIT at ____, ____, 637 F. Supp. 2d at 1152-53, 1155; *see generally* Issues and Decision Memorandum at 41-43.[44]  As with the Final Results on cardboard packing cartons, the Final Results on plastic jars and lids found the use of Indian import statistics preferable to domestic price quotes submitted by the GDLSK Plaintiffs, which were obtained from three different Indian vendors in three different cities and are comparable to the jars and lids used by the Chinese producers here.  *See* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1152-53; *see generally* Issues and Decision Memorandum at 41-43; GDLSK Respondents' Second Surrogate

---

[44]As they did with cardboard packing cartons, the Domestic Producers also placed the Indian import statistics on the record for use in valuing plastic jars and lids.  Significantly, however, the Domestic Producers have not sought to present any evidence directly challenging the domestic price quotes.  Nor have the Domestic Producers ever even claimed that the domestic price quotes are inaccurate or are not representative of prices throughout the period of review.  It is also telling that the Domestic Producers have not briefed this issue before the Court – not even in the prior stage of the proceeding.  *See* <u>Taian Ziyang</u>, 33 CIT at ____ n.63, 637 F. Supp. 2d at 1152 n.63 (noting that Domestic Producers elected not to brief issue of valuation of plastic jars and lids).  The Domestic Producers' participation on this issue was similarly limited in the underlying administrative review. *See* Issues and Decision Memorandum at 41 (noting that Domestic Producers filed no comments on issue of plastic jars and lids).  Presumably, if the price quotes submitted by the GDLSK Plaintiffs did not fairly reflect the price of plastic jars and lids throughout the period of review, the Domestic Producers would be the first to say so.

Value Submission (Admin. Record Pub. Doc. 258), Exh. 3 (domestic price quotes for jars and lids).[45]

The Final Results rejected the domestic price quotes because they assertedly do not constitute "publicly available information" and are not contemporaneous with the period of review,[46] and because, according to Commerce, they do not "reflect broad market averages and . . . cover a substantial period of time throughout the [period of review]" and thus, Commerce suggests, may reflect "temporary market fluctuations." *See* Issues and Decision Memorandum at 41-43; *see also* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1153-54.[47]

_____

[45]There is some confusion concerning the number of domestic price quotes for jars and lids on the administrative record. The Second Remand Determination asserts that the administrative record includes "*three* price quotes for plastic jars obtained from *three* Indian vendors." *See* Second Remand Determination at 47 (emphases added); *see also* Def. Response at 14 (stating that "Commerce rejected three price quotes for Indian plastic jars and lids"); GDLSK Comments at 9-10 (stating that "[t]here are two possible surrogate values: (1) . . . and (2) three price quotes . . ."). However, the Final Results indicate that the GDLSK Plaintiffs submitted *four* price quotes from *three* Indian suppliers. *See* Issues and Decision Memorandum at 41 (stating that "[t]wo of the four price quotes appear to be obtained from two Indian companies in direct response to a request for such prices, . . . and the remaining two quotes are taken directly from a price list from a third Indian company"); *see also id.* at 42 (referring to "[f]our price quotes from three different companies"); Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1152-53; GDLSK Respondents' Second Surrogate Value Submission (Admin. Record Pub. Doc. 258), Exh. 3 (domestic price quotes for jars and lids).

[46]The domestic price quotes are dated October 8, 2004, November 6, 2004, and November 22, 2004. *See* Issues and Decision Memorandum at 42; GDLSK Respondents' Second Surrogate Value Submission (Admin. Record Pub. Doc. 258), Exh. 3 (domestic price quotes for jars and lids); *see also* Taian Ziyang, 33 CIT at ____ n.64, 637 F. Supp. 2d at 1153 n.64 (*citing* Issues and Decision Memorandum at 42).

[47]Although Commerce has expressed concern about the temporal "representativeness" of the domestic price quotes for jars and lids (*i.e.*, concern that the price quotes "are obtained from so isolated a time frame as to be subject to temporary market fluctuations"), nothing in the Second Remand Determination or the Final Results indicates a concern about the geographic representativeness of the price quotes, which are from vendors in three different cities – Delhi, Bangalore, and Mumbai. *See* Second Remand Determination at 48; *see generally id.* at 46-50, 76-78 (expressing no concern about geographic representativeness); Issues and Decision Memorandum at 41-43 (same); GDLSK Respondents' Second Surrogate Value Submission (Admin. Record Pub.

Taian Ziyang analyzed all of the grounds cited in the Final Results as a basis for rejecting

the domestic price quotes, and found each of them lacking.  As to the public availability of the price

quotes, Taian Ziyang noted that – as with the administrative record on cardboard packing cartons

– the administrative record on plastic jars and lids includes "no evidence whatsoever to suggest that

[the price quotes obtained by the GDLSK Plaintiffs] were in any way subject to manipulation or

tainted by affiliation."  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1153.

In addition, Taian Ziyang explained that, although the domestic price quotes for plastic jars

and lids fall well outside the period of review, "[t]he contemporaneity of data is not as critical as

Commerce has suggested in this case."  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1153.

In support of that proposition, Taian Ziyang found Yantai Oriental "instructive."  *See id.*, 33 CIT

at ____, 637 F. Supp. 2d at 1153 (*citing* Yantai Oriental Juice Co. v. United States, 26 CIT 605, 616-

18 (2002)).  In Yantai Oriental, neither the domestic price statistics data nor the import statistics data

were contemporaneous with the period of review; but the domestic data were less contemporaneous

by more than a year.  *See* Yantai Oriental, 26 CIT at 616-18.  As Taian Ziyang noted, however, the

Yantai Oriental court nevertheless rejected Commerce's decision to rely on the more

contemporaneous import statistics data.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1153

(*citing* Yantai Oriental, 26 CIT at 616-18).[48]

---

Doc. 258), Exh. 3 (domestic price quotes for jars and lids).

[48]Taian Ziyang also pointed to Hebei Metals II, which stated that, "[w]hile the contemporaneity of data is one factor to be considered by Commerce . . . , three months of contemporaneity is not a compelling factor where the alternative data is only a year-and-a-half distant from the [period of investigation]," and that contemporaneity is "insufficient to explain why an import price is the best available information."  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp.

Taian Ziyang also questioned the Final Results' emphasis on "representativeness." Taian Ziyang reiterated that, while a preference for price data reflecting a substantial period of time (rather than data from a shorter period of time) may be reasonable where Commerce is deciding between two equally accurate surrogate values, the overall "calculus" is different where – as here – the data that are assertedly more "representative" are plagued with other infirmities.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1154.   In addition, Taian Ziyang criticized the Final Results' reliance on Shrimp from Vietnam on this point.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1154 (*citing* Issues and Decision Memorandum at 42 (discussing Shrimp from Vietnam, 69 Fed. Reg. 42,672)); *see also* section III.E, *supra*.  Specifically, Taian Ziyang noted that, among other things, there was affirmative evidence of price fluctuations in that case.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1154 (discussing Issues and Decision Memorandum at 42 and Shrimp from Vietnam, 69 Fed. Reg. at 42,684); *see also* section III.E, *supra*.   In contrast, Taian Ziyang emphasized, "no party points to any such evidence" in the case at bar.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1154.

Taian Ziyang recognized that "[n]o doubt the various concerns that Commerce outlined in the Final Results diminish, at least to some limited extent, the utility of the domestic Indian price

---

2d at 1153 (*quoting* Hebei Metals II, 29 CIT at 301, 366 F. Supp. 2d at 1275).  And, to the same general effect, Taian Ziyang quoted Dorbest I, which observed that "contemporaneity, in and of itself[,] should not be viewed as the sole reason to discard data; rather the quality of the data needs to be viewed in its totality."  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1153 (*quoting* Dorbest Ltd. v. United States, 30 CIT 1671, 1695 n.14, 462 F. Supp. 2d 1262, 1284 n.14 (2006), *aff'd in part*, *vacated in part*, *and remanded on other grounds*, 604 F.3d 1363 (2010)).

quotes for jars and lids." *See* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1154.[49]  However,

<u>Taian Ziyang</u> concluded that the Final Results failed to adequately analyze the relative merits of the

domestic price quotes and the seemingly much more seriously flawed Indian import statistics on

which Commerce relied.  *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1152, 1157.

Specifically, <u>Taian Ziyang</u> noted that, besides failing to acknowledge Commerce's well-

established general preference for domestic data over import statistics, the Final Results on plastic

jars and lids (much like the Final Results on cardboard packing cartons) similarly failed to

adequately address the fact that the Indian import statistics for plastic jars and lids not only are not

"product specific," but, moreover, capture products that are imported by air.  *See generally* <u>Taian

Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1155-57; *see also* Issues and Decision Memorandum at

41-43.  As such, <u>Taian Ziyang</u> explained, "the import data are distorted by air freight charges," as

well as by "other plastic products 'completely different from the plastic jars used by the GDLSK

[Plaintiffs] to pack . . . peeled garlic,'" as demonstrated by trade intelligence data from Infodrive

---

[49]As <u>Taian Ziyang</u> noted, in addition to concerns about the public availability, contemporaneity, and representativeness of the domestic price quotes, the Final Results also indicated that the price quotes did not clearly distinguish between the price of jars and the price of lids.  *See* <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1154 (discussing Issues and Decision Memorandum at 42).  However, it appears that Commerce now has resolved whatever concerns it might have had.  Reference to the issue is conspicuously missing from the Second Remand Determination.  *See* Second Remand Determination at 46-50, 76-78; *see also* Def. Response at 14-18 (similarly silent on the matter); <u>Taian Ziyang</u>, 33 CIT at ____, 637 F. Supp. 2d at 1154 (summarizing GDLSK Plaintiffs' proposal to address agency questions as to price of jars *versus* price of lids).

In any event, as discussed below, the issue of the valuation of plastic jars and lids is being remanded to Commerce yet again.  To the extent that any further price information is placed on the record on remand, the parties should ensure that the record is clear as to whether the stated prices are for jars or lids, or for both.

India that the GDLSK Plaintiffs submitted for Commerce's consideration. *See* Taian Ziyang, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1155-56 (quoting GDLSK Plaintiffs' brief); *see also* Issues and Decision Memorandum at 41-43.

Taian Ziyang concluded that the Final Results both "failed to adequately explain how the admittedly non-representative Indian import statistics constituted the 'best available information,' particularly in light of the availability of product-specific, domestic Indian price quotes for plastic jars and lids comparable to those actually used [by the Chinese producers] in this case," and, in addition, failed to "support [Commerce's] selection of the Indian import statistics by reference to substantial evidence in the record." *See* Taian Ziyang, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1157. The issue was therefore remanded to the agency for further consideration. *See id.*, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1157.

Regrettably, much like the Second Remand Determination's treatment of cardboard packing cartons (discussed above), the Second Remand Determination's treatment of plastic jars and lids does virtually nothing to advance the ball. *See generally* Second Remand Determination at 46-50, 76-78; GDLSK Comments at 9-14; GDLSK Reply Comments at 6-7; *see also* section III.E, *supra* (analyzing Second Remand Determination on cardboard packing cartons). On remand, Commerce reiterated its determination that the Indian import statistics are the "best available information" for use in valuing the GDLSK Plaintiffs' plastic jars and lids. *See* Second Remand Determination at 50, 78. However, as the GDLSK Plaintiffs correctly observe, "[s]imilar to the valuation of cartons, Commerce's Remand Redetermination [on plastic jars and lids] ignores the Court's instructions [in Taian Ziyang] and simply repeats the same reasoning previously found to be unpersuasive by the

Court." *See* GDLSK Comments at 10; *see also id*. at 13-14 (same); GDLSK Reply Comments at 6 (same).

There is no need to here restate in full the critique of the Second Remand Determination's treatment of cardboard packing cartons that is set forth above, which applies to the Second Remand Determination's treatment of plastic jars and lids with equal force. *See generally* section III.E, *supra*. It is enough to note that, notwithstanding the detailed analysis in <u>Taian Ziyang</u>, the Second Remand Determination indicates that Commerce took no action on remand to seek to determine the reliability of the domestic price quotes, in order to address the agency's concerns about potential "manipulation," which is the basis for the agency's preference for "publicly available" data. *See* Second Remand Determination at 47, 77 (discussing domestic price quotes and criterion of "public availability"); *see also id*. at 48, 50, 77 (referring to "the potential for manipulation inherent in accepting price quotes").[50] Similarly, Commerce apparently took no action on remand to obtain any

---

[50]The Final Results state that, of the domestic price quotes on the administrative record, two are "taken directly from a price list from a[n] . . . Indian company," and were not "obtained . . . in direct response to a request for such prices." *See* Issues and Decision Memorandum at 41; *see also id*. at 42 (same). But the Second Remand Determination fails to recognize that fact, and indicates that all of the price quotes were obtained in the same way. *Compare* Issues and Decision Memorandum at 42 (stating that only "*two of the four price quotes* that were submitted appear to be in response to a specific request for . . . prices") (emphasis added) *with* Second Remand Determination at 47 (indicating that *all of the price quotes* were "prepared specifically upon request"); *id*. at 77 (same). Further, neither the Final Results nor the Second Remand Determination ever explains why prices on price lists do not constitute publicly available information.

Moreover, to the extent that Commerce's preference for publicly available information is based on concerns about the potential for manipulation and collusion that is inherent in price quotes generally, the nature of the instant price quotes for jars and lids should help lay such concerns to rest, at least for purposes of this case. If one were inclined to forge or manipulate price data, presumably one would produce data that were more clearly decisive – in other words, one would generate a significant number of price quotes from throughout the period of review. *See generally*

further information to address the issues of the "contemporaneity" and "representativeness" of the domestic price quotes, by (for example) clarifying whether or not the prices of plastic jars and lids in fact do fluctuate significantly in India over relatively brief periods of time (or, more specifically, whether they did so during the period of review, and in the year or so thereafter).  *See generally* Second Remand Determination at 47-48, 77 (discussing "contemporaneity" and "representativeness" of domestic price quotes, and referring to agency's concern about potential "temporary market fluctuations").

While the Second Remand Determination paraphrases the Final Results' criticisms of (and says little else about) the domestic price quotes, it is virtually mum on the serious flaws in the Indian import statistics that were detailed in Taian Ziyang.  *Compare* Second Remand Determination at 46-50, 76-78 *and* Taian Ziyang, 33 CIT at ____, ____,  637 F. Supp. 2d at 1152, 1155-57.  Thus, nothing in the Second Remand Determination responds to the concerns expressed in Taian Ziyang about the Indian import statistics' lack of product specificity.  *See* Taian Ziyang, 33 CIT at ____, ____, 637 F. Supp. 2d at 1152, 1155-57.  Commerce made no attempt on remand to address the trade intelligence data placed on the record by the GDLSK Plaintiffs, or to otherwise ascertain the extent to which the values reflected in the Indian import statistics on plastic jars and lids are inflated by the inclusion of a vast array of "plastic products that do not resemble at all" the "simple, basic plastic jars at issue in this case."  *See id*., 33 CIT at ____, 637 F. Supp. 2d at 1155-56 (quoting GDLSK Plaintiffs' brief, and listing a "sampling" of the "myriad specialty products" reflected in the Indian

n.24, *supra*.  As discussed herein, however, there are no more than four price quotes on the administrative record of this case – and all of them post-date the period of review by at least 11 months.

import statistics); GDLSK Comments at 12 (noting that Second Remand Determination "has failed to adequately address the . . . concern" that Indian import statistics "reflect prices for jars and lids that are not at all representative of the jars and lids used by the GDLSK Plaintiffs"); *see also* Second Remand Determination at 49-50, 77 (acknowledging, without analyzing, Indian import statistics' lack of product specificity, and distortive effect of inclusion of products unlike plastic jars and lids at issue here).

Similarly, nothing in the Second Remand Determination responds to the concerns expressed in Taian Ziyang about the air freight costs reflected in the values derived from the Indian import statistics on which Commerce relies. *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1155-57; GDLSK Comments at 12. Commerce apparently made no attempt on remand to determine the volume of merchandise reflected in the Indian import statistics that was imported by air, or to otherwise demonstrate that the values reflected in the Indian import statistics are not significantly inflated by the inclusion of air freight costs. *See* Second Remand Determination at 49-50, 77 (acknowledging, without analyzing, distortive effect of inclusion of air freight charges in Indian import statistics).

The Second Remand Determination candidly concedes (as it must) that – like the Indian import statistics for cardboard cartons – the Indian import statistics on plastic jars and lids are "imperfect." *See* Second Remand Determination at 49-50, 77. In other words, the Second Remand Determination admits that the Indian import statistics reflect inflated values as a surrogate for the plastic jars and lids at issue here – both because the import statistics "include a broad range of products that are different from the plastic jars used to pack garlic," and because the import statistics

"include[] products that, unlike those the GDLSK [Plaintiffs] used, were shipped by air." *See id*. at 77; *see also id*. at 49-50 (same).[51]

On the other hand, apart from Commerce's previously expressed concern about differentiating between price quotes for lids and price quotes for jars (which the agency apparently has now resolved),[52] the domestic price quotes for jars and lids are "imperfect" only in the sense that it has not been established to Commerce's satisfaction that the price quotes were not manipulated and that the price quotes (which are not "contemporaneous," and, according to Commerce, may not be "representative") fairly reflect prices throughout the period of review.

In sum, here – as with the cardboard packing cartons – Commerce continues to choose *admittedly* distorted data over data that the agency speculates may be *potentially* distorted. Or, to make the point slightly differently, Commerce continues to choose *admittedly distorted* Indian

---

[51]As noted above, Commerce now unequivocally acknowledges the distortive effect of the air freight charges included in the Indian import statistics, just as it acknowledges the distortive effect of the inclusion of products that are not comparable to the plastic jars and lids used by the Chinese garlic producers. *See* Second Remand Determination at 77 (conceding that the Indian import statistics are distorted because, *inter alia*, they "include[] products that, unlike those the GDLSK [Plaintiffs] used, were shipped by air"). However, the Final Results did not concede that fact. *See* Issues and Decision Memorandum at 43 (arguing that "[s]ome companies import jars and lids into the PRC by air, others do not" and that "the respondents have not submitted any documents . . . demonstrating that their own domestic plastic jar and lid suppliers did not import the products into the PRC by air"). Indeed, at one point, even the Second Remand Determination appears to hedge a bit. *See* Second Remand Determination at 49-50 ("acknowledg[ing] that the data obtained through Indian import statistics *may not* perfectly represent the inputs used by respondent because the Indian import data include . . . products shipped by air") (emphasis added). In contrast, Commerce has never disputed that the Indian import statistics are distorted by the inclusion of products that are not comparable to the plastic jars and lids used by the Chinese producers. *See*, *e.g.*, Issues and Decision Memorandum at 43 (asserting that Indian import statistics are *sufficiently* specific to the plastic jars and lids at issue here).

[52]As explained in note 49 above, Commerce is no longer pressing this issue.

import statistics over *potentially "perfect"* price quotes.  And, as with cardboard packing cartons, Commerce apparently made its decision on jars and lids without conducting any analysis (not even a qualitative analysis, much less a quantitative one) to ascertain the extent of the *actual* distortion of the import statistics, for comparison to the extent to which (according to Commerce) the domestic price quotes might *potentially* be distorted.  As such, the Second Remand Determination's conclusions that the Indian import statistics are "sufficiently specific" and constitute the "best available information" for use in valuing plastic jars and lids are unexplained, are not rational, and lack any sound basis in the existing administrative record, and therefore cannot be sustained.  *See* Second Remand Determination at 50, 78.

The GDLSK Plaintiffs contend that this issue should be "remanded . . . to Commerce with instructions to use the domestic price quotes for the valuation of jars and lids."  *See* GDLSK Comments at 14.  Instead, much like cardboard packing cartons, the issue will be remanded for further consideration not inconsistent with the analysis herein and in <u>Taian Ziyang</u>, and with the caution that no further remands are likely.

On remand, Commerce shall reopen the record to evidence concerning the domestic price quotes and the Indian import statistics (as well as alternative sets of data, if any, that may be appropriate).  Commerce shall accept further evidence from the GDLSK Plaintiffs, in addition to any information that the agency wishes to place on the record; and Commerce shall allow the GDLSK Plaintiffs sufficient time to submit further evidence, to respond to any information that the agency may place on the record, and to provide comments on the agency's draft results of the remand.

### G.  Valuation of Ocean Freight

Taian Ziyang sustained the GDLSK Plaintiffs' challenge to the surrogate value that Commerce calculated for the respondent Chinese producers' ocean freight costs, which was based on rate quotes taken from the website of Maersk Sealand for shipment in refrigerated containers. Taian Ziyang therefore remanded the matter to the agency, with instructions to reconsider the issue. *See generally* Taian Ziyang, 33 CIT at ____, ____, ____, 637 F. Supp. 2d at 1101-02, 1157-62, 1166.

Taian Ziyang noted that the Chinese Producers placed two alternative sources of data on the administrative record.  One data set consists of public versions of the actual market economy ocean freight rates paid by two of the Chinese Producers (specifically, Harmoni and Linshu Dading) that made multiple shipments using a number of different market economy carriers throughout the period of review.  *See* Taian Ziyang, 33 CIT at ____, ____, 637 F. Supp. 2d at 1158, 1161.  Because the exact prices paid by the two Chinese Producers are proprietary information, the publicly available prices on the record are ranged within (plus or minus) 10% of the exact prices.  *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1158, 1161.  The second data set on the record is taken from the Descartes database (an online, fee-based subscription service), and reflects shipping rates for multiple carriers covering the entire period of review.  *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1158, 1159-61.[53]

_____

[53]The Descartes Carrier Rate Retrieval database is a web-based service similar to the World Trade Atlas (another online, fee-based database), which publishes the ocean freight charges of numerous carriers to destinations worldwide.  *See* Taian Ziyang, 33 CIT at ____ n.68, ____, 637 F. Supp. 2d at 1158 n.68, 1160; *see also* Second Remand Determination at 51 (describing the Descartes

In the Final Results, Commerce stated that the Maersk data were the "best available information," asserting that they were "the only publicly-available information to value ocean freight" on the administrative record. *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1158 (*quoting* Issues and Decision Memorandum at 51); *see generally* Issues and Decision Memorandum at 49-51. In reaching that conclusion, the Final Results dismissed as "imprecise" the publicly available "ranged" data on the actual shipping expenses incurred by the two Chinese Producers, stating that the agency lacked sufficient information to adjust the ranged prices to reflect the exact prices that the two Chinese Producers paid. *See* Taian Ziyang, 33 CIT at ____, ____, 637 F. Supp. 2d at 1158 (citation omitted), 1161. The Final Results also rejected the Descartes data, asserting that those data could not be corroborated because Commerce does not subscribe to the Descartes service. *See id.*, 33 CIT at ____, ____, 637 F. Supp. 2d at 1158, 1159-60.

As Taian Ziyang observed, however, the Maersk rates are significantly inflated, (1) by "the Qingdao-to-Hong Kong-to-U.S. shipping route that no respondent in this review actually used" and (2) by "the significant 'inland arbitrary charges'" – a charge of $1200 per container, also known as the "PRC arbitrary charge," that is imposed on cargo that is transported through Hong Kong – "that no respondent in this review actually incurred." *See* Taian Ziyang, 33 CIT at ____ & n.71, 637 F. Supp. 2d at 1158 & n.71 (citation omitted); Second Remand Determination at 50. In addition, the Maersk data reflect the rates of only a single freight carrier – and one of the most expensive carriers, at that. *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1158-59; *see also id.*, 33 CIT at ____,

_____

database as "a web-based service, accessible via paid subscription, which publishes the ocean freight rates of numerous carriers").

637 F. Supp. 2d at 1161.  Moreover, the Maersk data set is the only one of the three data sets on the record that is not specific to the transportation of fresh garlic.  *See id.* at 33 CIT at ____, ____, 637 F. Supp. 2d at 1159, 1161-62.

Taian Ziyang further observed that Commerce's grounds for rejecting the two alternative data sources were "just as flawed as the agency's bases for selecting the Maersk data" for use in the Final Results.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1159.  For example, Taian Ziyang noted that, contrary to the Government's assertions, Commerce has relied on Descartes data in the past to value international freight expenses in non-market economy cases.  *See id.*, 33 CIT at ____ & n.73, 637 F. Supp. 2d at 1160 & n.73.  Taian Ziyang also noted that the Descartes data cover the entire period of review.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1159.  In addition, Taian Ziyang emphasized that – in stark contrast to the Maersk data used in the Final Results – the Descartes data reflect the rates of multiple freight carriers, the Descartes data are specific to the shipment of fresh garlic, and, perhaps most importantly, the Descartes data are not distorted by either the aberrant Qingdao-to-Hong Kong-to-U.S. routing that none of the  respondent Chinese producers actually used or the "inland arbitrary charges" that none of the respondent Chinese producers ever paid.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1159.

To the extent that Commerce expressed concern about the "public availability" of the Descartes data, Taian Ziyang pointed out that ocean freight carriers use the Descartes database for the express purpose of complying with a Federal Maritime Commission ("FMC") regulation that requires all carriers to maintain *a public record* of their actual tariff rates for all routes.  *See* Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1160.  And, to the extent that Commerce's underlying

concern was the reliability of the Descartes data, <u>Taian Ziyang</u> noted that FMC regulations require that carriers' published rates be accurate to the best of their knowledge.  *See id.*, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1160-61.

      <u>Taian Ziyang</u> similarly criticized Commerce's rejection of the publicly available "ranged" versions of the actual rates paid by the two Chinese Producers.  <u>Taian Ziyang</u> noted that, contrary to the Government's claim that Commerce has "consistently" used Maersk rates in cases like this in the past, the agency in fact used publicly available "ranged" rates (rather than Maersk data) in the administrative review immediately preceding the review at issue here.  *See* <u>Taian Ziyang</u>, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1159.  <u>Taian Ziyang</u> further pointed out that, "[l]ike the Maersk data, the public, ranged versions of the rates reported by Harmoni and Linshu Dading encompass[] the entire period of review."  *See id.*, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1161.  However, unlike the Maersk data, the ranged data (like the Descartes data) reflect the rates of multiple freight carriers, are specific to the shipment of fresh garlic, and, perhaps most significantly, reflect not only the respondent Chinese producers' actual routing, but, in fact, reflect the shipping costs that they actually incurred.  *See id.*, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1161.[54]

---

      [54]<u>Taian Ziyang</u> criticized Commerce for its decision to use the Maersk data (rather than the "ranged" rates) based on the agency's alleged inability to adjust the "ranged" rates to reflect the exact prices paid by the two Chinese Producers.  <u>Taian Ziyang</u> noted that, contrary to Commerce's implications, it is simply not possible for the Maersk rates to be more accurate even if they are compared only to the unadjusted, publicly available "ranged" versions of the rates paid by the two Chinese Producers.  *See* <u>Taian Ziyang</u>, 33 CIT at \_\_\_\_, 637 F. Supp. 2d at 1161.

      As <u>Taian Ziyang</u> explained, "even assuming that the actual rates paid by the respondents were *10% higher than* (rather than, for example, 10% lower than) the ranged Harmoni/Linshu Dading rates, it is immediately evident that Commerce's selected surrogate freight rates [ – *i.e.*, the Maersk rates – ] are far in excess of a potential 10% distortion of the publicly ranged prices."  *See*

Taian Ziyang concluded that, in the Final Results:

Commerce . . . failed to adequately explain its reliance on the Maersk data as the "best available information," or to justify its selection of those data by reference to substantial evidence in the record, particularly in light of indications that the Maersk data reflect a route that no respondent used, that the Maersk data reflect additional charges that no respondent incurred, that the Maersk data are limited to a single freight carrier, and that – unlike the other rates available on the record – the Maersk data are not specific to the shipment of fresh garlic.  Commerce similarly failed to adequately consider the alternative sources of data on the record.

Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1162.

On remand following Taian Ziyang, Commerce re-evaluated all three sets of data on the record – that is, the Maersk data, the Descartes data, and the publicly available "ranged"data on the prices paid by two of the Chinese Producers – and determined that "the best available information with which to value ocean freight is price data obtained from the Descartes database for routes between [China] and both the East and West coasts of the United States."  See Second Remand Determination at 50-51; see generally id. at 50-53, 78-79.

In the course of the remand, Commerce learned that government agencies may access the Descartes database without charge, assuaging the agency's earlier concerns about its ability to verify the Descartes data.  See Second Remand Determination at 51.  In addition, the Second Remand Determination notes that "the Descartes routes avoid Hong Kong altogether, and, as such, . . . are

---

Taian Ziyang, 33 CIT at ____, 637 F. Supp. 2d at 1161 (internal quotation marks and citation omitted).  Taian Ziyang further observed that, unlike the Maersk data, "the Descartes quotes are within 10% of the public versions of the actual ocean freight costs on the record [i.e., the "ranged" rates]."  See id., 33 CIT at ____, 637 F. Supp. 2d at 1161(internal quotation marks and citation omitted).  Taian Ziyang summed up the situation thusly: "The Maersk rates that Commerce used in the Final Results are by far the highest of the three available surrogate values, and are patently aberrational by comparison to the other two" – including the actual rates paid by the Chinese Producers.  See id., 33 CIT at ____, 637 F. Supp. 2d at 1161.

free of any additional fees or charges not incurred by respondents." *See id.*  The Second Remand Determination concedes that the Descartes data therefore "are based on routes that more closely correspond to those used by respondents," as compared to the Maersk data on which the agency relied in the Final Results.  *See id.*  The Second Remand Determination also notes that the Descartes data are specific for refrigerated garlic, and that they reflect "a broad based market rate" because they "reflect rates for multiple carriers" and "for every month throughout the [period of review]." *See id.* at 51-52.

In the Second Remand Determination, Commerce acknowledges that – contrary to its findings in the Final Results – "the Maersk data are not sufficiently specific to the shipment of fresh garlic" and do not "reflect a broad based market rate," because "Maersk provides a general cargo rate from only a single carrier without any indication as to the type of cargo being shipped."  *See Second Remand Determination* at 51-52.  The Second Remand Determination further recognizes that, as Taian Ziyang emphasized, the Maersk data includes "a Qingdao-to-Hong Kong-to-U.S. route and the accompanying 'PRC arbitrary fee,'" both of which inflate the Maersk rates.  *See id.* at 52. Commerce determined that, because the Descartes data constitute "a publicly available source for ocean freight rates . . . that features routes more representative of those used by respondents," there is "no need to resort to the Maersk data to value ocean freight" here.  *See id.*  Commerce thus concluded that, given "the public availability, contemporaneity, and representativeness of the Descartes data, . . . the lack of specificity in the Maersk data leaves the Descartes database as the best source on the record for ocean freight surrogate values."  *See id.*

In the Second Remand Determination, Commerce continues to decline to use the publicly available "ranged" versions of the market economy ocean freight rates actually paid by Harmoni and Linshu Dading. *See generally* Second Remand Determination at 52-53, 78-79. The Second Remand Determination acknowledges that the "ranged" prices are contemporaneous with the period of review and specific to the shipment of garlic. *See id.* at 52. However, Commerce states that the agency "prefers to draw its surrogate value sources from public information whenever possible," and that it is therefore the agency's "long-standing policy" to "use[] ranged data only when no better alternatives can be found." *See id.* at 53 (*citing* Policy Bulletin 04.1); *see also* Second Remand Determination at 78-79.

Having found the Descartes data to be "publicly available, specific to the costs incurred by respondents, and contemporaneous with the period of review," Commerce concludes in its Second Remand Determination that "there is no need to resort to the use of the ranged data from other respondents." *See* Second Remand Determination at 53; *see also id.* at 78-79. No party has filed comments on Commerce's Second Remand Determination on this issue.

Because Commerce's redetermination on remand is consistent with Taian Ziyang, and is supported by substantial evidence and otherwise in accordance with law, the Second Remand Determination on the valuation of ocean freight costs must be sustained.

## IV.  Conclusion

For all the reasons set forth above, Commerce's Second Remand Determination is sustained as to the surrogate value for garlic seed for the GDLSK Plaintiffs and FHTK, the surrogate value for irrigation costs for the GDLSK Plaintiffs and Dong Yun, the surrogate value for Dong Yun's

land lease costs, and the surrogate value for the GDLSK Plaintiffs' ocean freight expenses.  In

contrast,  Commerce's valuation of cardboard packing cartons and plastic jars and lids for the

GDLSK Plaintiffs must be remanded to the agency for further action not inconsistent with this

opinion; and, in accordance with the Government's request for a voluntary remand on the issue, the

surrogate value for the labor expenses of the GDLSK Plaintiffs and Dong Yun must also be

remanded.

     A separate order will enter accordingly.

                            /S/               Delissa A. Ridgway
                                                  Judge

Dated:  July 22, 2011
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| TAIAN ZIYANG FOOD<br>    COMPANY LTD., ET AL., | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | Consol. Court No. 05-00399 |
| *Defendant*, | : | |
| | : | |
| and | : | |
| | : | |
| FRESH GARLIC PRODUCERS<br>    ASSOCIATION, ET AL., | : | |
| | : | |
| *Defendant-Intervenors*. | : | |

## **ORDER**

In accordance with the opinion of the Court issued this date in this matter, it is hereby

ORDERED that this matter is remanded to the U.S. Department of Commerce for further proceedings not inconsistent with that opinion; and it is further

ORDERED that the Commerce Department shall file the results of this remand with the Court no later than October 20, 2011; and it is further

ORDERED that any comments on those results shall be filed no later than December 5, 2011; and it is further

ORDERED that the Commerce Department's response to comments shall be filed no later than December 20, 2011; and it is further

ORDERED that any reply to the Commerce Department's response to comments shall be filed no later than January 6, 2012.

/S/        Delissa A. Ridgway
                     Judge

Dated:  July 22, 2011
           New York, New York